17 A.3d 697

**Stephen P. NORMAN**

v.

**Scott C. BORISON, et al.**

**No. 70, Sept. Term, 2010.**

Court of Appeals of Maryland.

April 22, 2011.

632

634

Stephen P. Norman (The Norman Law Firm, Ocean View, Delaware; Gary E. Bair of Bennett & Bair, LLC, Greenbelt, MD), on brief, for petitioner.

Laura K. McAfee (Robert Brager and Sarah E. Albert of Beveridge & Diamond, P.C., Baltimore, MD), on brief, for respondents.

Stephan Y. Brennan (Kathleen Howard Meredith of Iliff, Meredith, Wildberger & Brennan, P.C., Pasadena, MD), on brief, for respondents.

Jessica Weber, Esquire, Francis D. Murnaghan Appellate Advocacy Fellow, Baltimore, MD, for Amici Curiae brief of Public Justice Center, American Civil Liberties Union of Maryland, Casa De Maryland, Legal Aid Bureau, Inc., and Public Citizen.

Kevin M. Goldberg, Esquire, Fletcher, Heald & Hildreth, PLC, Gregg P. Leslie, Esquire, The Reporters Committee for Freedom of the Press, Arlington, VA, for Amici Curiae brief of the Reporters Committee for Freedom of the Press, Maryland D.C. Delaware Broadcasters Association, Maryland–Delaware–District of Columbia Press Association and Society of Professional Journalists in Support of Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

HARRELL, J.

Alexander Chaudhry ("Chaudhry"), Ali Farahpour ("Farahpour"), and Petitioner, Stephen Norman ("Norman"), owned equal shares in the Maryland-registered limited liability company, Sussex Title ("Sussex").[1] Respondents here, all lawyers, filed on behalf of their clients a proposed class action lawsuit against multiple defendants-companies, including Sussex, for their alleged participation in "the single largest mortgage scam in Maryland history...."[2] Respondents did not name Norman as a defendant in any version of their original or amended complaints in any court, although, in their second amended complaint in the federal court, Norman was mentioned by name in certain allegations. Norman claims that Respondents defamed him by republishing the pleadings (which contained allegedly defamatory statements) to the press and on the internet, and by making verbal comments to the press about the lawsuit.[3]

For reasons to be explained, we hold that, on the circumstances of this case, an absolute privilege adheres to Respondents' republication of the pleadings in the mortgage scam case, as well as to their public comments about that case. Thus, we affirm the judgment of the Court of Special Appeals, which, by its reported opinion, affirmed the trial court's dismissal of Norman's defamation action. *See Norman v. Borison*, 192 Md.App. 405, 994 A.2d 1019 (2010).

---

**1.** Norman was Sussex's attorney also. He claims further that he was "known ... as Sussex's managerial contact responsible for all operations...." Indeed, "on or about July 13, 2007, [The Washington] Post ombudsman contacted Norman to speak on behalf of Sussex." *Norman v. Borison*, 192 Md.App. 405, 415, 994 A.2d 1019, 1025 (2010).

**2.** Respondents include Scott Borison, Janet Legg, and their law firm, the Legg Law Firm; Philip Robinson and his organization, Civil Justice, Inc., of which he is the executive director; and the Holland Law Firm, P.C., along with two of its attorneys, Peter Holland and Benjamin Carney. Mr. Carney was no longer employed by the firm at the time Norman filed this action.

**3.** Norman is asserting, as an individual, the defamation action that is the instigation for the present litigation.

## I.

### A. The "Mortgage Rescue" Scam.

As attributed to Respondent Philip Robinson, the mortgage rescue scam asserted in the underlying litigation was described as involving real-estate professionals (principally the Metropolitan Money Store enterprise) that:

> [T]arget[ed] homeowners who have thousands of dollars of equity in their homes, but who cannot keep up with their mortgage payments. These "professionals" promise[d] to rescue the homeowners from foreclosure by giving them a new mortgage with payments that they can afford. In reality, though, the scammers s[old] the property to a "straw buyer," who then t[ook] out a new, larger mortgage—a mortgage with fees that equal[ed] or exceed[ed] the amount of equity in the property. The lenders, title companies, and others involved in the transactions then split the "fees" (that is, the stripped equity) amongst themselves. The homeowners, who could not afford their original mortgage payments, ha[d] no hope of repaying the new, higher mortgage.

Without settlement companies like Sussex, who closed the transactions between lenders, sellers, and "straw buyers," the scam could not have succeeded.

### B. The Complaint in the Circuit Court for Prince George's County.

On 18 June 2007, Respondents filed a "class action suit on behalf of several hundred homeowners,"[4] in the Circuit Court for Prince George's County, "alleging that the Metropolitan Money Store, along with several other companies and real estate professionals, engaged in mortgage fraud." *Norman*, 192 Md.App. at 411, 994 A.2d at 1022–23. Without identifying which Sussex owners or employees participated individually and actually in the mortgage rescue scam, Respondents

---

4. In his brief, Norman acknowledges that the 18 June 2007 complaint proposed a "class action suit," although Respondents had not yet achieved class certification.

averred broadly that Sussex, a "title company," "aided and abetted the scam by closing . . . transactions in exchange for . . . repeat business and fees . . . ."

Norman posits, for purposes of his later defamation action, that Respondents provided to the press a copy of the complaint on the same day it was filed, but *before* it was filed. He infers this occurred because, on the filing day, a Baltimore Sun reporter telephoned Chaudhry and read verbatim to Chaudhry passages from the complaint. Norman highlights further that "[the Circuit Court for] Prince George's County . . . does not maintain an [online] case management system that would allow [the reporter] to monitor filings or obtain copies of filed documents [online]." Respondents do not contest this claim.

The day following filing of the proposed class action suit, 19 June 2007, The Baltimore Sun published an article about the scam lawsuit. In particular, the article explained that the complaint named at least six defendants, including Sussex. The article quoted Respondent Peter Holland as saying, without reference to any particular individual or company, "[w]e're talking about bad people." In the final paragraphs, the article, quoting from the complaint, reiterated that the defendants' "sole motive was to enrich their extravagant lifestyles at the expense of hardworking Marylanders. . . ."

Less than a month later, on 12 July 2007, The Washington Post published an article regarding the lawsuit. It mentioned, in passing, that apparently Sussex was not answering its phones at its offices. It quoted Respondent Philip Robinson as stating that the defendants' "sole motive seemed to be to enrich their lavish lifestyles as opposed to saving the homes of the vulnerable homeowners from foreclosure." [5]

---

5. "[The Washington Post] article was republished in full in the Maryland Daily Record newspaper on July 13, 2007. Again, the article did not specifically mention Norman." *Norman*, 192 Md.App. at 415, 994 A.2d at 1025.

C. *The Initial Complaint in the United States District Court for the District of Maryland ("federal district court").*

On 24 July 2007, Respondents dismissed voluntarily their action in the Circuit Court for Prince George's County and refiled their claim in federal district court. According to the federal complaint, by July 2007, "it became apparent that the fraud ... extended across three different jurisdictions [*i.e.,* interstate]...." The initial federal complaint asserted the same allegations as the previous State action, and added Chaudhry—a part owner of Sussex—as a named defendant. Norman was not sued or named in the initial federal complaint in any capacity.

The next day, The Baltimore Sun published an article about the federal litigation relating to the mortgage rescue scam. It included Respondent Scott Borison's statement that, "[a]s we kept investigating the case, it became clear that there were also federal charges to be asserted.... Metropolitan Money Store was out stealing the equity in people's homes and on top of that, getting it tax free." June Arney, *Federal Court Gets Home–Equity Suit; Md. Case Grows into Class Action Seeking Recovery of Homes Swindled from Owners*, BALT. SUN, 25 July 2007, at 3D. The article mentioned that Sussex was named as a defendant, and included a comment attributed to Chaudhry claiming that Sussex was a victim equally of Metropolitan Money Store's scam.

D. *The First Amended Complaint in the Federal District Court.*

Respondents, on 21 January 2008, amended their initial filing, removing Sussex as a defendant, which had filed for bankruptcy protection. The first amended complaint also added Farahpour as a defendant, as well as Wilbur Ballesteros ("Ballesteros"),[6] a former employee of Sussex. ("This matter

---

6. In a parallel federal criminal proceeding, Ballesteros pled guilty to fraud for his part in the mortgage rescue scam. *See United States v. Jackson*, Crim. No. 8:08–Cr–00288–RWT (D. Md. filed 11 June 2008).

involves the single largest mortgage scam in ... Mid–Atlantic history ... and involved the willful participation of so-called real estate professionals—including ... licensed settlement agents Sussex Title, LLC ... and its part owners and employees, Alexander Chaudhry, ... Ali Farahpour ... [and] Wilbur Ballesteros...."). The first amended complaint, however, did not name Norman as an involved third party or defendant.

In the vast majority of instances where the complaint refers to the "owners and employees of Sussex," it included a qualifying descriptor. For example, the complaint states that "[t]o finance the foreclosure reversal transactions, the owners and/or employees of Sussex ... Chaudhry, Farahpour and Ballesteros arranged and settled federally related mortgage loans...." [7] In most other occasions, the first amended complaint refers to the Sussex-related participants as "Sussex, Chaudhry, Farahpour and Ballesteros...." [8]

E. *The Second Amended Complaint in the Federal District Court.*

On 29 September 2008, a federal trial judge dismissed the first amended complaint, but gave Respondents leave to refile. *See Proctor v. Metro. Money Store Corp.,* 579 F.Supp.2d 724, 727 (D.Md.2008). In seeking dismissal, Chaudhry and Farahpour argued that "[Respondents] have failed to state a claim ... because they have failed to make specific factual

---

7. According to Norman, "[t]he [first amended] complaint contained allegations that 'anyone at Sussex' could have discovered the scheme, including 'the respective principals' and the 'owners and employees of Sussex.'" After scouring the first amended complaint, we can find no use of the phrase "anyone at Sussex." The five appearances of the phrase "respective principals" appears, in context, to refer to the principal-agency relationship between the title insurance companies and Sussex, among others.

8. Respondent Robinson claims that "Mr. Norman has not identified a single instance where [any version of the complaint] attribute[s] any fraudulent activities to him personally either by name or by position." Because we anchor our holding in the waters of absolute privilege, we need not identify any traditional defamatory remarks (nor, for that matter, opine on the compatibility of a small business exception to Maryland's standing principles applicable to defamation claims).

allegations as to how either of these individuals participated in the alleged scheme." *Proctor*, 579 F.Supp.2d at 742. In other words, by grouping together Chaudhry, Farahpour, and Ballesteros in their first amended complaint, Respondents suggested that "all [of the defendants] delivered one check, recorded one deed, instructed one buyer to sign a document, and received one fax." *Proctor*, 579 F.Supp.2d at 743 (internal quotation marks and citations omitted). The federal district court held that this repeated grouping "must be read as an allegation that one of the three [defendants] did each act" and, therefore, is deficient speculation under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *Proctor*, 579 F.Supp.2d at 744. Thus, in any subsequent complaint, Respondents were obliged to allege "what specifically each Defendant did (not what the group did) to fulfill his role in the scheme." *Id.*

Respondents filed a more specific, second amended complaint on 14 November 2008, alleging that "Mr. Ballesteros defrauded [homeowner clients], and that Mr. Chaudhry and Mr. Farahpour failed to supervise Mr. Ballesteros, thereby facilitating the fraud." Respondents removed Ballesteros as a defendant, however, because, like Sussex, Ballesteros had sought the protective harbor of bankruptcy. Although this version of the complaint, again, did not name Norman as a defendant, it identified him by name in certain averments. In this regard, the second amended complaint alleged that:

- The payments to Ballesteros were items paid out of the share of monthly proceeds to Farahpour, Chaudhry, and Norman.
- Sussex is an entity owned and controlled by Farahpour, Chaudhry, and a third person, Steven Norman.... Sussex changed its name from CapTitle and filed for bankruptcy in the U.S. Bankruptcy Court of Maryland in late 2007. Based on the testimony of Norman in connection with the bankruptcy case, Sussex was operated for the financial benefit of the three owners since Ali Farahpour would review the company's records and make an equal monthly distribution to each of the three based on the money

received by the company during the given month after payment of expenses and leave some amount of reserve for future expenses.

- Wilbur Ballesteros was paid a salary out of Chaudhry, Farahpour and Norman's share of the revenues generated by the operation of Sussex as well as a bonus per settlement in which he was involved.
- Upon information and belief, the fees and other charges collected by Sussex in connection with this transaction were disbursed at the direction of Farahpour to Farahpour, Chaudhry and Norman.
- Farahpour participated through the use of his entity Money Tree Funding and by dividing up the funds received from these transactions to himself, Chaudhry, and Norman.[9]

### F. *Respondents' Website.*

Sometime in the Fall of 2007, after filing their initial complaint in the federal district court, Respondents created a website, http://www.metromoneystore.com, on which they eventually posted links to the three iterations of the federal complaint. Respondent Robinson claims that the website was intended to "give notice to the class about the lawsuit." Indeed, the federal district judge "expressly permitted the use of the internet to communicate with class action litigants." *Norman*, 192 Md.App. at 427, 994 A.2d at 1032. Nonetheless, Norman asserts that these publications were "incomplete," at least in part, because they were redacted heavily and "did not provide the reader with the facts ... or the various exhibits which strongly contradicted the allegations...."

### G. *Norman, et al., Strike Back.*

On June 18, 2008, Norman, Sussex, Chaudhry, and

9. Whether naming Norman was a necessary or appropriate response to the federal district court's invocation of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), as Respondents assert, remains to us a dubious proposition.

Farahpour filed a complaint for defamation [10] in the Circuit Court for Montgomery County. In November 2008, the defamation complaint came to the attention of the federal court during a hearing on Chaudhry and Farahpour's Rule 11 motion against [Respondents] concerning the class action litigation. The court stated: "I find that the litigation brought by Messrs. Chaudhry and Farahpour in the Circuit Court for Montgomery County is patently intended to interfere with the jurisdiction of this court and to chill attorneys before this court and I simply will not tolerate it." Thereafter, Chaudhry and Farahpour dismissed their defamation claims in the circuit court.

On January 5, 2009, Norman filed a second amended complaint in the circuit court. The complaint consisted of fourteen counts for defamation, negligence, civil conspiracy, and injurious falsehood. The complaint alleged that [Respondents] defamed Norman by circulating copies of the state and federal complaints to a newspaper reporter, the internet, and by speaking to a reporter. The complaint also singled out certain statements by individual [Respondents]. [Respondents] moved to dismiss the complaint.

On February 19, 2009, the court held a hearing on [Respondents'] motion to dismiss and took the matter under advisement. On February 20, 2009, the court issued an order dismissing Norman's complaint with prejudice. The order first noted that "[o]verall, there is no allegation in any of the counts of any 'falsity,' a required element of defama-

---

**10.** Under Maryland law, a plaintiff asserting a defamation claim must plead and prove, in order to succeed, four elements:

> (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm. A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.

*Offen v. Brenner*, 402 Md. 191, 198–99, 935 A.2d 719, 723–24 (2007) (internal quotation marks and citations omitted).

tion." The order then dismissed the following counts based on absolute privilege:

1) Count I (Publishing the state complaint to the Baltimore Sun);

2) Count III (Publishing the state complaint to the Washington Post);

3) Count V (Publishing the federal complaint to the Baltimore Sun);

4) Count VII (Publishing the federal complaint on the internet);

5) Count VIII (Publishing the first amended complaint on the internet);

6) Count IX (Publishing the second amended complaint on the internet);

7) Count X ( [Respondent] Borison's reply to Chaudhry's Rule 11 Motion); and

8) Count XI ( [Respondent] Borison's opposition to notice of sale claims by the estate).

With regard to the above eight counts, the order stated that "Maryland law makes no distinction between internet press and written press.... Additionally [Norman] has no standing because he is not a named party to the aforementioned suit."

The court dismissed the following counts because Norman "has no standing to allege the [ ] causes of action:"

1) Count II ( [Respondent] Holland's 6/19/07 defamation to the Sun);

2) Count IV ( [Respondent] Robinson's 7/12/07 defamation to the Post); and

3) Count VI ( [Respondent] Borison's 7/25/07 defamation to the Sun).

The court dismissed Count XII (negligence) for failure to state a cause of action under Maryland law. Count XIII (injurious falsehood) and Count XIV (civil conspiracy) were dismissed as duplicitous.

Norman appeals from the [judgment], but does not challenge dismissal of Counts IV, XII, XIII or XIV.

*Norman*, 192 Md.App. at 416–419, 994 A.2d at 1026–27. In other words, the Circuit Court decided that Norman waived his defamation claim against Respondent Robinson, while preserving his claim against Respondents Holland and Borison.[11] Norman appealed to the Court of Special Appeals.

H. *The Court of Special Appeals's "Take."*

In a reported opinion, the Court of Special Appeals addressed initially the issue of standing. *See Norman*, 192 Md.App. at 420, 994 A.2d at 1027. Norman argued that he had standing because Respondents made defamatory, extrajudicial comments to the press, which were understood by persons who had dealt with Sussex to be aimed at him. *See Norman*, 192 Md.App. at 420, 994 A.2d at 1028. Moreover, as they filed and re-filed their complaint, Respondents not only alluded to him generally, but eventually named him outright in averments in the second amended complaint. *See id.*

The intermediate appellate court organized the allegedly defamatory statements into two categories—those that named Norman directly and those that may have "referred to him by virtue of his position with Sussex." *Norman*, 192 Md.App. at 420, 994 A.2d at 1028. Regarding the former, they were held not to be defamatory, but merely a "description of Norman's business relations with the company he owned [in part]." *Norman*, 192 Md.App. at 421–22, 994 A.2d at 1028–29. Regarding the latter, they targeted the company, Sussex, not Norman. "Where [a] company holds a right of action in tort," our appellate brethren continued, "th[e] right does not extend to the company's owners, just as a cause of action that belongs to an owner individually [does] not extend to the company."

---

11. On 21 May 2010, Chaudhry and Farahpour entered into a settlement agreement with Respondents' clients, in which Chaudhry and Farahpour agreed to pay $40,000 into a common fund, among other things, seemingly without admitting liability. *See* Notice of Settlement, Case 8:07–cv–01957–RWT, By Order of the U.S. District Court for the District of Maryland (filed May 21, 2010).

*Norman*, 192 Md.App. at 422, 994 A.2d at 1029. Moreover, the appellate panel observed that the tort allegations specified that "Sussex owners and employees" referred to Chaudhry, Farahpour, and Ballesteros—not Norman; therefore, Norman lacked standing to assert the claims he advanced.

Assuming, for the sake of argument, that Norman had standing, the Court of Special Appeals concluded that the "allegedly defamatory statements are [nonetheless] protected by absolute privilege." *Norman*, 192 Md.App. at 423, 994 A.2d at 1030. Regarding the allegations in the complaints (as opposed to the press "sound bites"), the intermediate appellate court reiterated that the " '[a]bsolute judicial privilege applies to statements contained in pleadings, affidavits, or other documents directly related to the case.' " *Id.* (quoting *Offen v. Brenner*, 402 Md. 191, 200, 935 A.2d 719, 724 (2007)) (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 403–04, 494 A.2d 200, 203 (1985)) (internal quotation marks omitted). "To date, Maryland courts have not held that redistribution or dissemination of [such] pleadings will void privileged status...." *Norman*, 192 Md.App. at 427, 994 A.2d at 1032. To do otherwise would suggest that courtroom proceedings and pleadings, once filed, are no longer "open to the public," *Baltimore Sun Co. v. Mayor & City Council of Baltimore*, 359 Md. 653, 662, 755 A.2d 1130, 1135 (2000), or "public property." *Rosenberg v. Helinski*, 328 Md. 664, 669, 616 A.2d 866, 873 (1992). The panel of the intermediate appellate court distinguished the principal cases on which Norman relied [12] on the basis that the present case stemmed from a proposed class action suit. *See Norman*, 192 Md.App. at 427, 994 A.2d at 1032.

▮ Regarding Respondents' verbal comments to the press, the Court of Special Appeals analyzed *Kennedy v. Cannon*,

---

12. These cases included *Kennedy v. Cannon*, 229 Md. 92, 182 A.2d 54 (1962); *Woodruff v. Trepel*, 125 Md.App. 381, 725 A.2d 612 (1999); and *Chinwuba v. Larsen*, 142 Md.App. 327, 790 A.2d 83 (2002), *aff'd and rev'd on other grounds by Larsen v. Chinwuba*, 377 Md. 92, 832 A.2d 193 (2003).

229 Md. 92, 182 A.2d 54 (1962). Fearing a lynching of an African–American suspect for the alleged rape of a Caucasian woman, the suspect's attorney in *Kennedy* called the press, in an effort to defuse the tension, claiming the intercourse was consensual. *See Kennedy,* 229 Md. at 94, 182 A.2d at 55. In declining to extend the absolute privilege to the attorney's public "defense" of his client, the Court cautioned that not all "statement[s] made by an attorney after the inception of a judicial proceeding will be privileged." *Kennedy,* 229 Md. at 97, 182 A.2d at 57. Rather, to be protected, statements must be made "during the course of," *i.e.,* "as part of," a judicial proceeding. *Kennedy,* 229 Md. at 97–98, 182 A.2d at 57–58.

The intermediate appellate court observed that Respondents "did not make any comments to the newspaper that were both slanderous *per se* and directly identified Norman." *Norman,* 192 Md.App. at 425, 994 A.2d at 1030. Moreover, in contrast to *Kennedy,* Respondents filed pleadings with the court. *See id.* Considered together, Respondents "were not attempting to set up a slanderous defense to the allegation of rape or some other crime in the press [like in *Kennedy* ]." *Norman,* 192 Md.App. at 425, 994 A.2d at 1031.

The Court of Special Appeals affirmed the judgment of the Circuit Court. We granted Norman's petition for writ of certiorari, *Norman v. Borison,* 415 Md. 337, 1 A.3d 467 (2010), to consider whether:

(1) [T]he lower court improperly rule[d] that [Norman], as owner of a small, unique business, lacked standing to sue for defamation when the defamatory statements personally referred to [Norman]? [13]

---

**13.** We granted certiorari in this case primarily to reach and decide the important question of privilege. Accordingly, we shall assume, for the purposes of this opinion and without deciding the first question presented, that Norman had standing to assert his defamation claim. In bypassing the first question, however, we should not be understood to subscribe necessarily to the Court of Special Appeals's reasoning with regard to its disposition of the standing issue.

(2) [T]he lower court err[ed] in concluding that the absolute litigation privilege extends to the republication of incomplete judicial pleadings to the press and on the internet?

## II. Absolute Privilege

The crux of this case is the doctrine of absolute privilege. Accordingly, we shall describe our understanding of its contours before applying the law to the present, assumed factual circumstances. There are at least three situations implicating an absolute privilege in the context of this case.

### A. *Statements Made in a Judicial Proceeding.*

█ Although an understated principle in our caselaw, the application of an absolute privilege differs depending on whether the putative tortfeasor is a witness/ party/ judge, or an attorney of record in the case. For witnesses, parties, and judges, we employ the "English" rule, which provides that the putative tortfeasor enjoys absolute immunity from civil liability, even if the statement is wholly unrelated to the underlying proceeding. *See Keys,* 303 Md. at 404, 494 A.2d at 203 ("We [follow] the minority or 'English' rule which afford[s] the absolute privilege to *witnesses and parties* without the necessity of demonstrating the relevance of the statement to the pending litigation." (citing *Korb v. Kowaleviocz,* 285 Md. 699, 402 A.2d 897 (1979) (emphasis added))); *Adams v. Peck,* 43 Md.App. 168, 173, 403 A.2d 840, 843 (1979) ("[N]ote that the English decisions relied upon all dealt with words spoken from the witness stand.").

█ For attorneys whose appearances are entered in a case, however, we follow the majority American rule and require that the defamatory statement have some rational relation to the matter at bar before unfurling the umbrella of absolute privilege. *See Korb,* 285 Md. at 702, 402 A.2d at 898 ("It was perfectly competent for this court ... to follow and adopt the ... American decisions in regard to the privilege of the advocate, and to follow and adopt the rule of the English courts as regards the privilege of the witness." (quoting

*Hunckel v. Voneiff*, 69 Md. 179, 198–99, 14 A. 500, 505 (1888))); [14] *see also Adams v. Peck*, 288 Md. 1, 3 n. 1, 415 A.2d 292, 293 n. 1 (1980) ("Defamatory statements made by judges, parties and witnesses are absolutely privileged even though they have no relation to the judicial proceeding. However, an attorney's defamatory statement is absolutely privileged only if it has some relation to the judicial proceeding."). The privilege "extends not only to defamatory statements made in the courtroom during the course of the trial, but also to such statements published in documents which have been filed in a judicial proceeding." *Adams*, 288 Md. at 3, 415 A.2d at 293 (citations omitted).

 In any case, the putative tortfeasor is protected "even if his [or her] purpose or motive was malicious, he [or she] knew that the statement was false, or his [or her] conduct was otherwise unreasonable." *Id.* We give the privilege a "broad and comprehensive" interpretation, so as to "foster the

---

14. Our basis for the distinction was:

The great importance to the administration of justice that witnesses should testify with minds absolutely free from the apprehension of being annoyed by civil actions for any thing they may say as witnesses, has already been pointed out. They are commonly untrained in legal learning, and often timid and uneducated. They are brought into court by the mandate of the law, and compelled to testify, usually for the benefit of others. On the other hand lawyers practice their profession voluntarily and for their own emolument. By their professional training they are taught, and it is their business to know, what is pertinent or relevant to the trial of a case. They are educated and intelligent men, and their position is a most honorable and important one. Their legitimate privileges are very great, and it seems to me, with great deference to the differing opinions of others, not unreasonable that they should be held civilly responsible to parties injured by an abuse of them. Nor does there seem to be the same strong ground of public policy for protection in their case. At all events it was perfectly competent for this court, having the questions before them for the first time in these cases, to follow and adopt the current of the American decisions in regard to the privilege of the advocate, and to follow and adopt the rule of the English courts as regards the privilege of the witness. This is what has been done and it does not seem to me that the privilege of the two are so tied together either by reason or authority as to make these decisions inconsistent and irreconcilable.

*Hunckel v. Voneiff*, 69 Md. 179, 198–99, 14 A. 500, 505 (1888).

'free and unfettered administration of justice.' " *Keys,* 303 Md. at 404, 494 A.2d at 203. "The ultimate purpose of the judicial process is to determine the truth." *Adams,* 288 Md. at 5, 415 A.2d at 294.

### B. *Statements Made in a Quasi–Judicial Proceeding.*

Likewise, a decision-maker/adjudicator, witness, or party in a *quasi*-judicial proceeding who makes a defamatory statement *in the proceeding* is shielded by the privilege, if the proceeding satisfies the two part test of *Gersh v. Ambrose,* 291 Md. 188, 434 A.2d 547 (1981). To don also the protective armor of the privilege, an attorney of record must demonstrate additionally that his or her statement was relevant to the matter at hand. In *Gersh,* a witness before the Baltimore City Community Relations Commission alleged that a commission staff member committed "obstruction of justice and subornation of perjury." *Gersh,* 291 Md. at 189, 434 A.2d at 547. The witness, Gersh, argued that he was protected by the absolute privilege because he was "speaking as a witness at a public hearing and . . . his statements were made in response to questions asked him at this hearing." *Gersh,* 291 Md. at 189, 434 A.2d at 548.

We held that the absolute privilege applies only to certain types of administrative proceedings. In sorting out which types of proceedings merit this protection, we probe: "(1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." *Gersh,* 291 Md. at 197, 434 A.2d at 552. In other words, we examine the significance of "the public interest sought to be advanced" and the protective trial-like attributes of the proceeding. *Gersh,* 291 Md. at 196, 434 A.2d at 551; *see id.* (stating that the two factors balance the public's interest in full disclosure with the "harm of subjecting the individual to possible legal injury without remedy"). Because the administrative hearing in *Gersh*— before the Baltimore City Community Relations Commission—neither advanced a sufficiently compelling public interest nor possessed suitable procedural safeguards, we rejected

extending the absolute privilege. *See id.*; *see also McDermott v. Hughley,* 317 Md. 12, 26, 561 A.2d 1038, 1045 (1989) (holding that the absolute privilege did not apply to a psychiatrist who, after meeting with a park police officer, issued a defamatory report because there were "insufficient procedural safeguards" during the meeting).

## C. *Statements Made Extrinsic to a Judicial or Quasi–Judicial Proceeding.*

██ Some forty-nine years ago, we considered an out-of-court statement in *Kennedy,* where an attorney—fearing a possible lynch mob targeting his client—reached out to the press to defend his client from the perceived wrath of the mob. *See Kennedy,* 229 Md. at 94, 182 A.2d at 55. We noted the distinction that "absolute immunity extends ... [to] defamatory statements uttered *in the course of a trial* or contained in pleadings, affidavits, depositions, and other documents *directly related* to the case." *Kennedy,* 229 Md. at 97, 182 A.2d at 57 (emphasis added). Owing in part to the breadth of this language, we extended the privilege in *Adams* to defamatory statements made prior to (and, therefore, outside of) a proceeding, reasoning that a qualifying statement could be "directly related to the pending litigation and [published] *during the course* of the judicial proceeding." *Adams,* 288 Md. at 8, 415 A.2d at 295 (emphasis added). *Adams* (published a year before *Gersh* ) has spawned sophisticated progeny on the subject of out-of-court defamation, which deserve further comment.

██ These extrinsic statements occur commonly in three categories: (1) statements made with the direct purpose or effect of producing a judicial or quasi-judicial proceeding, *e.g.,* a police brutality complaint, (2) statements "prepared for *possible* use in connection with a pending judicial proceeding," *Adams,* 288 Md. at 4, 415 A.2d at 294 (emphasis added), but which remain unfiled at the time of the alleged injury, and (3) statements that are not designed necessarily to produce a proceeding or cause one to be "filed," but which are connected contextually to a pending or ongoing proceeding.

We extend the absolute privilege to these three categories of statements for the traditional reason—to encourage the free divulgence of information in pursuit of justice. More specifically, we apply the privilege because "[t]he evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth . . . as is the presentation of such facts and opinions during the course of the trial. . . ." *Adams*, 288 Md. at 8, 415 A.2d at 295; *see also Offen*, 402 Md. at 202, 935 A.2d at 726 ("[T]he basis for extending absolute immunity [is] to prevent unduly hindering important speech, and to ensure that otherwise actionable conduct thus is protected where the accused acts in furtherance of a recognized socially important interest.") (internal quotation marks and citation omitted).

### 1. *Statements Producing a Proceeding.*

■■■ As to the first category, we consider whether the proceeding, *which results from the statement*, serves an important public interest and possess adequate procedural safeguards. As examples, in *Miner v. Novotny*, 304 Md. 164, 174–77, 498 A.2d 269, 273–75 (1985), and *Imperial v. Drapeau*, 351 Md. 38, 50–51, 716 A.2d 244, 250–51 (1998), we held that absolute privilege protected citizens who filed complaints with governmental entities against a deputy sheriff and an emergency medical technician, respectively.[15] The possible harm stemming from these defamatory complaints was "outweighed by the public's interest in encouraging the filing and *investigation* of valid complaints." *Miner*, 304 Md. at 176, 498 A.2d at 275 (emphasis added); *see also Imperial*, 351 Md. at 50, 716

---

**15.** Although somewhat awkwardly, this Court invoked *Gersh* to evaluate statements not precipitating a "proceeding" per se. In *Smith v. Danielczyk*, 400 Md. 98, 928 A.2d 795 (2007), we considered whether the absolute privilege applies to statements in a search warrant application. Acknowledging that a warrant application "is not in the nature of an administrative proceeding, as in *Gersh*," we applied the *Gersh* factors and concluded that the absolute privilege should not be extended because a warrant application's procedural safeguards were insufficient. *Smith*, 400 Md. at 125–26, 928 A.2d at 811–12.

A.2d at 250–51 ("[P]ublic policy encourages the communication of information to public authorities responsible for maintaining the quality of emergency medical services.").

## 2. *Prefatory Statements.*

The second category involves statements prepared for possible use in a judicial or quasi-judicial proceeding, "regardless of whether the [statement] has been filed." *Adams,* 288 Md. at 8, 415 A.2d at 295. For instance, in *Adams,* a husband and wife entered into a separation agreement, whereby the wife would receive physical and legal custody of the children and the father visitation rights. *See Adams,* 288 Md. at 2, 415 A.2d at 292. Later, the wife began to doubt the propriety of the father's visitation. *See id.* She sent her children to see a psychiatrist, who concluded ultimately that "the father had abused one of the children, and that he was 'an ill man and in definite need of psychiatric treatment.' " *Adams,* 288 Md. at 2, 415 A.2d at 292–93. The wife sought modification of the visitation rights on that basis. *See Adams,* 288 Md. at 2, 415 A.2d at 293. The father alleged that the psychiatrist defamed him. *See Adams,* 288 Md. at 2–3, 415 A.2d at 293.

Concluding that an absolute privilege protected the statements by the psychiatrist, the *Adams* Court reasoned that his statements were "published in a document which [wa]s prepared for possible use in connection with a pending judicial proceeding. . . ." *Adams,* 288 Md. at 4, 415 A.2d at 294. Any other holding would permit a potential plaintiff to say, " 'I do not bring the action against you for what you said in the witness-box, but I bring the action against you for what you told the solicitor you were about to say in the witness-box.' " *Adams,* 288 Md. at 7, 415 A.2d at 295 (quoting *Watson v. M'Ewan,* (1905) A.C. 480(HL)). The " 'public policy which renders the protection of witnesses necessary . . . must as a necessary consequence involve that which is a step towards and is part of the administration of justice—namely, the preliminary examination of witnesses to find out what they can prove.' " *Id.* (quoting *Watson* ).

### 3. Statements Made During the Course of a Pending or Ongoing Proceeding.

Many statements are not designed to be filed in a court action, but rather are simple communications by or between individuals connected to some pending or ongoing proceeding—hence, a third category. A canvass of relevant caselaw reveals that, for the most part, Maryland courts attempt to preserve the distinction of what must be established for the privilege to apply—regarding "relevance"—between witness, *et al.*, and attorneys of record.

#### a. *Witnesses, Parties, and Judges.*

In *Odyniec v. Schneider*, 322 Md. 520, 588 A.2d 786 (1991), a former patient filed a medical malpractice claim before an arbitration panel. Before the proceeding, she underwent a physical examination, during which the examining doctor— "who was expected to later present his expert testimony before the arbitration panel"—"told the patient that her previous doctor[, in fact] had performed unnecessary medical procedures on her." *Offen*, 402 Md. at 203, 935 A.2d 719, 726 (citing *Odyniec*, 322 Md. at 523–24, 588 A.2d at 787–88). After observing the public purpose and the procedural safeguards embedded in the arbitration proceeding, we concluded that the examining doctor made his statement (1) *while* "conducting a medical examination of [the patient-plaintiff]" and (2) *"to* [the patient], a party in the then-pending arbitration proceeding. . . ." *Odyniec*, 322 Md. at 534, 588 A.2d at 793 (emphasis added). Based on these facts, we held that the doctor, a potential witness, made his statement during "the course of his participation in th[e] pending [arbitration] proceeding"; consequently, his "verbal statement [wa]s accorded the same absolute privilege as if it had been made by a witness during the arbitration hearing itself." *Id.*; *see Adams*, 288 Md. at 8, 415 A.2d at 295 (extending the absolute privilege to a statement because it was published "during the course of the judicial proceeding"). That the "defamatory statement may have been gratuitous, unsolicited, and in part irrelevant to the

purpose for which [the doctor] was employed" did not defeat recognition of the privilege. *Odyniec,* 322 Md. at 534, 588 A.2d at 793.

In *Sodergren v. Johns Hopkins University Applied Physics Laboratory.,* 138 Md.App. 686, 697, 773 A.2d 592, 603 (2001), the Court of Special Appeals concluded that the absolute privilege protected an employer who sent apology letters, pursuant to a settlement agreement in a pending suit, to a putative victim of sexual harassment and false plagiarism accusations. After a prodigious discussion of Maryland and foreign caselaw, the intermediate appellate court agreed that "settlement is a part of a judicial proceeding. . . ." *Sodergren,* 138 Md.App. at 701, 773 A.2d at 601. "[T]here is a sufficient nexus between a judicial proceeding and the settlement of that proceeding . . . to extend the [absolute] privilege to the statements made by [the defendant] *regarding* [the plaintiff] and *published to* [parties involved in the original litigation]." *Sodergren,* 138 Md.App. at 705, 773 A.2d at 603 (emphasis added). In *Sodergren,* the Court of Special Appeals recognized also that the proceeding satisfied the *Gersh* test and that the employer wrote the letter as part of "the settlement agreement," *i.e.,* "in the *context* of a judicial proceeding." *Sodergren,* 138 Md.App. at 701, 773 A.2d at 601 (emphasis added). The intermediate appellate court found instructive that the instrument containing the challenged statements was of a judicial nature, *i.e.,* out-of-court settlement of a lawsuit, and the statements were published to parties involved in the original litigation. *See Sodergren,* 138 Md.App. at 704–05, 773 A.2d at 603–04 ("[T]his case do[es] not require us to reach the issue of publication to a third person not directly involved in the case."). Therefore, the Court concluded that "the letter . . . was published in the 'course of a judicial proceeding'. . . ." *Sodergren,* 138 Md.App. at 704, 773 A.2d at 603.

 The foregoing analyses teach us to apply an absolute privilege to out-of-court statements, made by witnesses, parties, or judges, when (1) the contemplated or ongoing

proceeding fulfills *Gersh*,[16] and (2) the context of the statement demonstrates that it was made "during the course of" the proceeding (*i.e.*, while the putative tortfeasor was participating in the proceeding). We assess the context of the statement by asking, among other things: what was the overall or general reason for the instrument or letter (but not the motive of the challenged statement itself, *see* English rule)[17]; what was the defendant doing when he or she made the statement; and to whom did he or she make the statement.

If these factors are present, protection of the communication serves the ultimate purpose of the privilege—to loosen the otherwise secure floodgates of information required for the successful resolution of a judicial or quasi-judicial proceeding. The proceeding, however, must be "actually contemplated in good faith and under serious consideration.... The bare possibility that [a] proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." RESTATEMENT (SECOND) OF TORTS § 588 cmt. e. (2006); *see also Kennedy*, 229 Md. at 98, 182 A.2d at 58 ("[T]he extension of this absolute privilege to statements not made in the judicial

---

**16.** *See Sodergren v. Johns Hopkins Univ. Applied Physics Lab.*, 138 Md.App. 686, 700, 773 A.2d 592, 601 (2001) ("[T]he need for procedural safeguards 'comes into play largely as part of the determination of whether the allegedly defamatory statement was made in a judicial or quasijudicial proceeding.'") (quoting *Woodruff*, 125 Md.App. at 399, 725 A.2d at 621).

**17.** Pursuant to the English rule, a witness, party, or judges does not need to demonstrate the relevance of a challenged out-of-court statement to the contemplated or underlying proceeding. He or she must show, however, that the alleged defamatory statement was made in a context—*e.g.*, settlement negotiations or a letter memorializing a conversation regarding visitation rights—connected sufficiently to a proceeding, so that a court may conclude that statement was made "during the course of the proceeding." To say a letter or email was sent, or a conversation was had "during the course of a proceeding" is to say the letter, email, or conversation had some general "relevance," relationship, or connection to that proceeding. The specific alleged defamatory statement contained therein, however, need not have a similar relevance.

proceeding itself is limited . . . by the comments on the rule of the Restatement itself. . . .").

### b. *Attorneys of Record.*

With respect to attorneys of record in a judicial or quasi-judicial proceeding, Maryland caselaw adds the requirement of relevance of the statement to the proceeding before an absolute privilege may apply. In *Woodruff v. Trepel*, 125 Md.App. 381, 725 A.2d 612 (1999), an attorney in a custody dispute sent a letter to opposing counsel, summarizing a recent conversation. In the letter, the attorney referred to in-court testimony, which alleged that the opposing party had abused his child physically and verbally. *See Woodruff*, 125 Md.App. at 388, 725 A.2d at 616. The Court of Special Appeals held that absolute privilege immunized the attorney from culpability for defamation for this statement because his letter was "rationally related to and reference[d] the underlying [child custody] litigation, in addition to a possible future litigation." *Woodruff*, 125 Md.App. at 394, 725 A.2d at 619; *see also Woodruff*, 125 Md.App. at 393, 725 A.2d at 618 (quoting *Maulsby v. Reifsnider*, 69 Md. 143, 162, 14 A. 505, 510 (1888), for the principle that " 'if counsel in the trial of a cause maliciously slanders a party . . . in regard to a matter that has no reference or relation to, or *connection* with, the case before the Court, he is and ought to be answerable in an action by the party injured' ") (emphasis added);[18] *Arundel Corp. v. Green*, 75 Md.App. 77, 84–85, 540 A.2d 815, 819 (1988) (holding that an absolute privilege would extend to an attorney's letter

---

18. The attorney sent his client a copy of the letter, and the client, in turn, sent a copy of it to her child's school principal. Consistent with our analysis of non-attorney putative tortfeasors, *supra* Part II.C.3.a, the Court of Special Appeals held that absolute privilege did not apply to the client's republication because the "school's knowledge [of the letter's contents] . . . did not have any actual or potential effect upon the custody proceeding. . . ." *Woodruff*, 125 Md.App. at 401, 725 A.2d at 622; *see also Chinwuba*, 142 Md.App. at 394–95, 790 A.2d at 122–23 (declining to extend an absolute privilege to Chair of the Maryland Insurance Administration's comments to the press, during the agency's investigation of an HMO, among the reasons, because they were made "to an entity with no conceivable role" in the agency's process).

sent to a stone supplier's customers—as part of his investigation into his clients' potential asbestos claims, resulting from exposure to stone dust—if it was made "in connection with" and "ha[d] some relation to the anticipated proceeding").

 These cases indicate that Maryland courts extend an absolute privilege to an attorney of record, so long as (1) the contemplated or ongoing proceeding meets the *Gersh* test, (2) the context of the statement evinces that the statement was made "during the course" of the proceeding, and (3) the statement has some rational, articulable relevance or responsiveness to the proceeding.[19] If so, then extension of the privilege would serve the ultimate goal of information exchange and discovery of the truth.[20]

---

**19.** To be clear, whether a statement is relevant to a matter implicated in a contemplated or ongoing proceeding is "not the evidentiary relevance test." *Woodruff*, 125 Md.App. at 392, 725 A.2d at 618 (citation omitted). As we stated more than a hundred years ago:

"[R]elevant" and "pertinent" are not the best words that could be used. These words have in a measure a technical meaning, and we all know the difficulty in determining in some cases what is relevant or pertinent.... We prefer the words *"having reference"* or *"made with reference"* or the language ... *"having relation to the cause or subject matter."* And if counsel in the trial of a cause maliciously slanders a party, or witness or any other person in regard to a matter that has no reference or relation to, or connection with, the case before the Court, he is and ought to be answerable in an action by the party injured.

*Maulsby v. Reifsnider*, 69 Md. 143, 162, 14 A. 505, 510 (1888); *see also Kennedy*, 229 Md. at 98, 182 A.2d at 58 ("[T]he extension of this absolute privilege to statements not made in the judicial proceeding itself is limited ... by the comments on the rule of the Restatement itself...."); Restatement (Second) of Torts § 586 cmt. e. (2006) ("As to communications preliminary to a proposed judicial proceeding the rule stated in this Section applies only when the [attorney's] communication has some relation to a proceeding that is contemplated in good faith and under serious consideration.").

**20.** We cast no light here on the law of conditional or qualified privilege. We observe only that a conditional privilege is somewhat similar to the third category—statements made during the course of a pending or ongoing proceeding. Whether a conditional or absolute privilege exists depends, at least in part, on the identities of the communicating party and recipient. *See McDermott v. Hughley*, 317 Md. 12, 28, 561 A.2d 1038 (1989) ("[A conditional privilege exists] 'when the occasion shows that the communicating party and the recipient have a mutual interest

## III.

A. *Respondents' Publication of the Complaints to the Press.*

Norman avers that Respondents provided the press with a copy of the complaint before it was filed in state court and, thus made it public "before its time." [21] Accepting this factual averment in Respondents' favor, as did the Court of Special Appeals, we may say fairly that a complaint is a public document and "[t]he law does not distinguish where, or in what manner, a public document is viewed." *Norman,* 192 Md.App. at 427, 994 A.2d at 1031–32. If we assume that the State complaint was not public yet when given to the press and, importantly, this initial version—which did not identify by name any owner or employee of Sussex—defamed Norman sufficiently for standing purposes,[22] our analysis, but not the result, would change.

In the assumptive latter scenario, the complaint appears to be a statement instigating an investigation and/or proceeding. If so, because the complaint was not communicated to an

---

in the subject matter, or some duty with respect thereto.' " (quoting *Simon v. Robinson,* 221 Md. 200, 206, 154 A.2d 911 (1959))); *Hanrahan v. Kelly,* 269 Md. 21, 28, 305 A.2d 151, 156 (1973) ("An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.") (internal quotation marks and citation omitted). The most significant difference, of course, is that a conditional privilege may be lost where actual malice is found to exist. *See Marchesi v. Franchino,* 283 Md. 131, 139, 387 A.2d 1129, 1133 (1978).

21. Norman alleges similarly that Respondents provided a copy of their initial federal complaint to the press before it was filed. Our analysis, regarding Respondents' publication of the State complaint to the press, is applicable equally to Respondents' publication of the initial federal complaint to the press.

22. In reviewing the grant of a motion to dismiss, we must "presume[ ] the truth of all well-pleaded facts in the [c]omplaint, along with any reasonable inferences derived therefrom in a light most favorable to plaintiffs." *Pittway Corp. v. Collins,* 409 Md. 218, 234, 973 A.2d 771, 780–81 (2009) (citation omitted).

authorized or germane investigating body, its delivery had neither the necessary investigatory design nor possible effect in order to qualify for refuge in the first category (*i.e.,* statements producing a proceeding), as delineated *supra*. Considered under the second category, the complaint can be viewed as a statement prepared for a pending proceeding. Most complaints are meant to be filed in a court. Militating against this characterization, however, is the fact that Respondents delivered the draft complaint to the Fourth Estate, which, its self-image notwithstanding, is uninvolved in the "evaluation and investigation of facts and opinion" in this context or the "generat[ion] of such documents...." *Adams,* 288 Md. at 8, 415 A.2d at 295. Thus, category two (*i.e.,* prefatory statements) is an ill fit.

 Considered in its best light, however, the complaint is simply a third-party communication, made extrinsic to an imminent proceeding. As discussed *supra,* we evaluate whether the underlying proceeding satisfies the prongs of *Gersh,* which it does manifestly. Importantly, we analyze also whether the context of the challenged statements supports the conclusion that they were made during the course of the proceeding. Respondents, at worst, published their allegedly defamatory statements in a draft version of their ultimate pleading, which they handed-over to the press on the same day the pleading was filed. By republishing or reporting on those erstwhile pleadings, the press could be seen as a tool assisting in the notification to potential class members of the contemplated proceedings. Thus, we conclude that Respondents issued these statements during the course of the putative class action.[23]

---

**23.** To explain further why Respondents' republication of the State-filed complaint to the press may be viewed as participation in the prosecution of their tort claims, we must give a nod to the niceties of class action law. In the initial State complaint, Respondents sought certification as a class. *See* Maryland Rule 2–231(c) ("[T]he court shall determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action."). When and how plaintiffs provide notice of a class action is left largely to the

Finally, as Respondents were the attorneys of record, we also inquire as to whether the statements themselves (not necessarily the instrument or conversation in which they were made) had some relevance to the matter presented to the trial

discretion of the trial court, pursuant to Md. Rule 2–231(e), which provides that "[i]n a class action maintained under subsection (b)(3)," a common strain of class action suit, "notice shall be given to members of the class in the manner the court directs." The trial court may require plaintiffs to provide notice at the very first stage in the class action lawsuit. *See* Md. Rule 2–231(f) ("[T]he court may enter [an] appropriate order[ ] . . . requiring that notice be given . . . to some or all of the members of *any step in the action* . . . .") (emphasis added); *see also* J.A. LYNCH, JR. & R.W. BOURNE, MODERN MARYLAND CIVIL PROCEDURE § 4.9(d)(3) (2nd ed. 2004) ("[T]he court may, under Rule 2–231(f), require that the class representative provide to some or all of the class members of any step in the action. . . .").

Moreover, nothing in Rule 2–231 indicates that what the trial court decides—with respect to the provision of notice—should be taken as a ceiling, *i.e.,* the maximum effort plaintiffs must exert to notify potential class members. To the contrary, the Rule leaves open the possibility that plaintiffs may act preemptively in identifying and notifying others of their possible claims. In other words, while the Rule may not require "notice to class members at the commencement of the suit," MODERN MARYLAND CIVIL PROCEDURE § 4.9(c)(2)(a), nor does it prevent notice from being provided at that time.

Md. Rule 2–231 is derived from Federal Rule of Civil Procedure 23. As such, our interpretation of the former may be guided, at least in part, by the history and development of the latter. Federal courts have interpreted their rule as encouraging early notification. *See Anne Arundel County v. Cambridge Commons*, 167 Md.App. 219, 233, 892 A.2d 593, 596 (2005) ("Because individuals are included in the class, and must then opt out, Fed.R.Civ.P. 23(c)(2) indicates that class members . . . be notified early enough to allow voluntary exclusion prior to a judgment in the suit and early enough to allow for effective appearance of counsel." (citing *Peritz v. Liberty Loan Corp.*, 523 F.2d 349, 354 (7th Cir.1975))). With respect to the notification process, the federal rule does not require individual identification of all potential class members, as a "requisite in class actions." *Weaver v. Prince George's County*, 34 Md.App. 189, 200, 366 A.2d 1048, 1055 (1976) (citing *Hansberry v. Lee*, 311 U.S. 32, 40–41, 61 S.Ct. 115, 117–18, 85 L.Ed. 22, 26 (1940)). Presumably, therefore, notification in a newspaper, which cannot guarantee individual notification, may be an appropriate tactic in certain instances.

Respondents' publication of their State complaint may be seen legitimately as helping notify potential class members, a step in the administration of justice; thus, their publication was connected sufficiently to the contemplated proceeding to be made "during the course" of that proceeding.

court. We conclude that the Respondents' challenged statements in the State complaint were related sufficiently to the subject of inquiry—the mortgage rescue scam.

B. *Respondents' Republication of the Federal Complaints on the Internet.*

By the time Respondents published the initial federal complaint on the internet in the Fall of 2007, they had filed it, thereby making it a public document. *Once a document is made public,* Maryland law does not limit who, where, or the extent to which one may view that document. Thus, publication of the by-now public federal complaint does not bar application of the absolute privilege. There is, too, the additional fact that republication of the complaints served the previously noted and judicially-cognizable purpose—the notification of potential class members of ongoing litigation, in which they may have a stake. Moreover, we conclude that the complaints were not redacted so extensively as to render them fundamentally distinct from the public documents that were filed with the federal district court. It appears Respondents omitted mostly exhibits, rather than substantive averments, from their internet republication.

C. *Respondents' Verbal Statements to the Press.*

Respondents provided the press not only a copy of their State complaint, but also with verbal "sound bites" to be included presumably in any forthcoming news articles. As mentioned *supra,* Norman waived his defamation claim against Respondent Robinson, but preserved it with respect to Respondents Holland and Borison. Respondent Holland was quoted purportedly in a 19 June 2007 Baltimore Sun article as saying, "[w]e're talking about bad people.... A mortgage foreclosure rescue scam is worse than predatory lending. They find out how much equity is in the house, and they come at you like vultures." June Arney, *Class Action Alleges Home Equity Theft; Foreclosure–Rescue Firms Object of Suit,* BALT. SUN, 19 June 2007, at 1E. Respondent Borison was quoted purportedly in a 25 June 2007 Baltimore Sun article as stating,

"[a]s we kept investigating the case, it became clear that there were also federal charges to be asserted.... Metropolitan Money Store was out stealing the equity in people's homes and on top of that, getting it tax free." *Federal Court Gets Home–Equity Suit*, at 3D.

 We conclude that an absolute privilege protects Respondents Holland's and Borison's statements. The contemplated proceeding in the courts meet the *Gersh* test. After reviewing the news articles in their entirety, it appears Respondents made the statements while promoting public awareness of their proposed class action claim and, thus, while participating in the course of the proceeding. The two news articles (published the day after filing the initial State complaint and the initial federal complaint, respectively) provided readers (*i.e.,* possible class members) with details about how the mortgage rescue scam worked, when it took place, who was involved potentially, and who was targeted likely. We are not prepared to say that plaintiffs are prohibited from promoting preemptively their class action suit, before they have been certified as such, or that they must avoid verbal communications to the press in doing so—provided framing the suit as a "class action" status is not shown to have been a subterfuge for funneling defamatory statements to the press. Such public promotion, under the latter proviso, is not part of the proper prosecution of most tort claims. Indeed, but for the fact that the mortgage rescue scam suit was striving to become a class action, our conclusion might have been different. The *Kennedy* adage retains vitality—lawyers who try their cases in the media do so at some peril. *See Kennedy*, 229 Md. at 99, 182 A.2d at 58.

Because Respondents were attorneys of record in the case, we must determine also whether their statements were relevant or had some relation to the underlying proceeding. Respondent Holland's suggestion that "[w]e're talking about bad people" comes close to being irrelevant due to its breadth and generality. His other remark, however, makes reference to the mortgage rescue scam that was the subject of the suit,

and, *in these particular circumstances,* we are unable to ascertain or state with confidence on this record what prompted his comment, let alone what prefaced or followed it.

We hold that an absolute privilege applies to Respondents' challenged statements. As a result of our holding, we need not reach the question of whether Respondents' statements in their pleadings and press sound bites injured Norman sufficiently to sustain his defamation claim.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**