*Kathleen Anderson, et al. v. Evan Hammerman, et al.*, No. 1254, Sept. Term, 2023. Opinion filed on November 6, 2024, by Wells, C.J.

**LITIGATION PRIVILEGE – SCOPE – DEFAMATION**

The common law litigation privilege provides immunity from civil liability for certain statements made by a putative tortfeasor during judicial proceedings. The privilege does not broadly apply to all torts. Nor does it cover all claims predicated on statements made in court. To the contrary, the privilege has been applied narrowly, usually only to claims alleging reputational injury from disparaging statements made in litigation.

The scope of the privilege extends to claims other than defamation only when false statements made in litigation cause injuries to reputation-related interests, in circumstances when immunity is reasonably necessary to ensure litigants may speak without concerns about being held civilly liable for such statements. In this case, because Consumers alleged economic injuries from an attempt to collect money a debt collector allegedly knew was not owed, rather than disparagement of consumers' reputations, the privilege does not bar the consumers' claims under the Maryland Consumer Debt Collection Act (MCDA) and Maryland Consumer Protection Act (MCPA).

**LITIGATION PRIVILEGE – SCOPE – CONFLICT**

A common law defense like the litigation privilege may be abrogated expressly, by enactment of a statute containing an explicit exclusion, or by implication, through adoption of a statutory scheme that so conflicts with the common law right that the two cannot coexist.

There is no conflict between the common law litigation privilege and statutory liability under the MCDCA/MCPA. Even if the litigation privilege might apply to defamatory statements made in collections litigation, it would not immunize debt collectors from liability for their unfair and deceptive practice of knowingly filing suit against consumers to demand money that is not owed.

**LITIGATION PRIVILEGE – SCOPE – PURPOSE AND PRECEDENT**

When interpreting a statute, we consider its legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under "scrutiny" because our goal is to advance its purpose, not to frustrate it. Both the MCDCA and MCPA prohibit practices that are unfair and abusive trade practices in the collection of consumer debts.

Reading the statutory scheme to preclude application of the common law litigation privilege to claims against debt collectors for violating the MCDCA and MCPA is consistent with the purpose and goals of these remedial statutes, to provide consumers a remedy for unfair debt collection practices and collectors an incentive not to commit them. Further, construing the MCDCA and MCPA to foreclose a litigation privilege defense to such claims is also consistent with our precedent applying these statutory remedies. As Consumers and Amici point out, recent Maryland case law features examples of MCDCA/MCPA claims predicated on litigation asserting a right to payment that those debt collectors allegedly knew they did not have – none of which were foreclosed by an assertion of litigation privilege as a complete defense.

**LITIGATION PRIVILEGE – SCOPE – PROFESSIONAL SERVICES EXEMPTION**

Violations of the MCDCA are "a per se violation of the MCPA as an 'unfair, abusive, or deceptive trade practice'" under Com. Law § 13-301(14)(iii). However, Commercial Law § 13-104(a)(1) expressly does not apply to professional services rendered by several different professions, including lawyers.

This Court holds that an attorney's conduct that falls outside their duties as a lawyer—here, submitting allegedly false affidavits describing the nature and amount of his legal services in support of the attorneys' fee component of lawsuits filed by Collectors—falls within commercial aspects of law practice that are not exempt under the MCPA and MCDCA.

Circuit Court for Montgomery County
Case No.: C-15-CV-22-004542

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1254

September Term, 2023

_____

KATHLEEN ANDERSON, ET AL.

v.

EVAN HAMMERMAN, ET AL.

_____

Wells, C.J.,
Leahy,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Wells, C.J.

_____

Filed: November 6, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In this appeal, appellants Kathleen Anderson and Bianca Diehl ("Consumers"), supported by three public service organizations ("Amici"),[1] contend that the Circuit Court for Montgomery County erred in dismissing their putative class action complaint alleging that appellees, the Center for Innovative GYN Care, P.C.; Innovations Surgery Center, P.C.; 42 Services, LLC d/b/a Tower Surgical Partners; and Evan Hammerman (collectively, "Collectors"), violated Maryland's Consumer Debt Collection Act ("MCDCA") and Consumer Protection Act ("MCPA") by filing lawsuits against them in

---

[1] With the consent of all parties pursuant to Md. Rule 8-511(a)(1), this Court granted permission to file a joint *amici curiae* brief to three non-profit consumer advocacy organizations.

In that brief, the Public Justice Center ("PJC") describes itself as a "civil rights and anti-poverty legal advocacy organization" that is committed "to advancing the rights of low-income consumers" by participating in Maryland cases "[t]hrough a racial equity analysis" to "guard[] consumer rights in a variety of contexts[,]" including cases involving "low-income renters . . . who often face predatory practices by landlords[.]" The PJC asserts "an interest in this case because of its commitment to ensuring that low-income consumers and communities of color in particular are not subjected to unfair or deceptive debt collection."

The CASH Campaign of Maryland (Creating Assets, Savings and Hope) ("CASH") "promotes economic advancement for low-to-moderate-income individuals and families across Maryland . . . through direct service programs, building capacity, and leading policy and advocacy initiatives to strengthen family economic stability." CASH asserts "an interest in this case because abusive debt collection by litigation for medical debts not owed threatens the economic stability of its clients and statistically leads to bankruptcies which should be unnecessary and fosters instability for Maryland families."

The Maryland Volunteer Lawyers Service ("MVLS") provides "pro bono civil legal services to low-income Marylanders," including by securing representation for 3,353 Marylanders in FY23, with "[a]pproximately 30% of its cases focused upon consumer issues like foreclosure, tax sale, bankruptcy, and debt collection including medical debt collection." MVLS asserts "an interest in this case . . . because the outcome will have an immediate and significant impact on our client's ability to achieve financial, housing and family stability for its clients and the community at large."

an attempt "to collect money that is not owed to them or not owed at all." *See* Md. Code, § 14-202(8) of the Commercial Law Article ("Com. Law"); Com. Law § 13-301(14)(iii).

In dismissing the complaint, the circuit court concluded, among other things, that Maryland's common law litigation privilege barred such claims against debt collectors like the Collectors here.

Consumers then appealed to this Court and present three questions for our review:

1. Does the common law litigation privilege provide immunity from statutory consumer protection claims under the [MCDCA] and [MCPA]?

2. Does the professional services exemption to the [MCPA] apply to a claim alleging that an attorney violated the Act by misrepresenting fees incurred by his client, where the attorney is seeking to collect those fees from a consumer under a contractual fee-shifting clause?

3. Did the Circuit Court err in holding that Appellants failed to state a claim against 42 Services, LLC t/a Towers Surgical Partners?

In responding to the first question, we resolve an issue of first impression. Construing the common law litigation privilege in light of its purpose and scope, and these consumer protection statutes in light of their language, remedial purpose, and legislative history, we hold that Collectors are not immune from MCDCA/MCPA liability for filing suit against consumers to demand payment of money that Collectors allegedly know is not owed.

We also conclude that the statutory exemption for professional services in the MCPA, Com. Law § 13-104(a)(1), does not foreclose relief against Hammerman for attempting to collect attorneys' fees based on allegedly false statements about his legal services as in-house counsel for Tower Surgical Partners and affiliates. Likewise, the challenged complaint is sufficient to state a claim against Tower Surgical Partners for

2

unfair debt collection practices. Because the circuit court erred in ruling that Consumers failed to state viable MCDCA and MCPA claims against Collectors, we will reverse the judgment dismissing Consumers' Corrected Amended Complaint (the "Complaint") and remand for further proceedings.

## BACKGROUND

When determining whether the circuit court erred in dismissing the Complaint, we must assume the averments in it are true. *See Williams v. Ewrit Filings, LLC*, 253 Md. App. 545, 549 n.1, *cert. denied*, 478 Md. 518 (2022). Consequently, our background summary is predicated on those allegations.

After each Consumer underwent surgery performed by an Innovative GYN Care physician,[2] Collectors filed lawsuits, claiming Consumer owed more for those medical services, over and above what her health insurer paid. According to Consumers, Innovative GYN Care charges and bills for the services of its surgeons and is affiliated with the following entities seeking to collect for related services:

- 360 Surgical Services, LLC ("360 Surgical Services"), which bills for services rendered by surgical assistants;

- Innovations Surgery Center, which "shares the principal address of [Innovative GYN Care]" and bills for the use of surgical facilities;

- Tower Surgical Partners, which bills on behalf of Innovative GYN Care and files collection actions for them, 360 Surgery Services, and Innovations Surgery Center; and

---

[2] According to the Complaint, on August 16, 2018, Dr. Paul MacKoul operated on Anderson at a surgical center, after she signed an agreement to pay charges from "Innovations Amb Surgery Center, Inc.," but received bills from Innovation Surgery Center and 360 Surgery Services. "Diehl underwent surgery at [Innovative GYN Care]" on "April 29, 2021[.]"

3

- Evan Hammerman, who is Tower Surgical Partners' general counsel "and is de facto in-house counsel for Innovations Surgery Center, Innovative GYN Care, and 360 Surgery Services and other affiliated entities that this medical practice uses[,]" and filed complaints against Consumers on behalf of Innovative Surgery Center and Innovative GYN Care.

Both Consumers received checks from their health insurers as covered payments for their medical services. Although Diehl's insurer denied coverage for some services that it determined were duplicative, not medically necessary, or submitted with incorrect identifying information, Tower Surgical Partners previously told her that her account would be "zeroed" if she endorsed and forwarded her insurance checks to Innovations Surgery Center and 360 Surgery Services, at a post office box in Pennsylvania that Tower Surgical Partners owned. In addition, Innovative GYN Care's "'Financial Policy Disclosure Statement' provided to Diehl at the time of surgery promised '[w]e will not balance bill for any amounts not covered with the out-of-network benefit as long as the payment you receive is given in full to [] Innovative GYN Care.'" Tower Surgical Partners told Anderson the same, so that once Tower Surgical Partners received her checks, "'she would be good' and her account would be 'zeroed.'"

Both Consumers, following instructions from Tower Surgical Partners, sent the checks they received from their insurers to a post office box in Pennsylvania. Based on statements by Tower Surgical Partners and Innovative GYN Care, neither believed she owed anything else.

Nevertheless, Collectors filed the following complaints:

- Represented by Hammerman, Innovations Surgery Center filed suit against Anderson in the District Court for Montgomery County, claiming she owed $12,856.25 in principal, $1,859.75 in prejudgment interest, plus $1,928.44 in attorneys' fees. In support, attached bills showed charges from Innovations Surgery Center for $1,356.25 and from 360 Surgery Services (which was not a party to the lawsuit) for $11,500.

- Represented by Hammerman, Innovative GYN Care and Innovations Surgery Center filed suit against Diehl in the Circuit Court for Charles County, claiming a total debt of $66,934.64. An attached bill from 360 Surgery Services, who again was not a party to the suit, showed unpaid charges of $14,190.48.

In both lawsuits, the complaints are accompanied by affidavits from Hammerman and Anna Grigoryan-Santos, who is also a Tower Surgical Partners employee. Using nearly identical language in each, Grigoryan-Santos asserted that she had personal knowledge that the allegations in the complaints were true because the Consumers owed the claimed amounts for medical services. In his affidavits, Hammerman stated that he billed Innovative GYN Care for "at least" six hours of work before filing each case, which included drafting motions for summary judgment, even though he never filed such a motion in either case and could not have done so in the district court case because summary judgment is not available in that forum.

On December 12, 2022, Consumers filed a putative class action complaint against Innovative GYN Care, Innovations Surgery Center, Tower Surgical Partners, and Hammerman. According to Consumers, these Collectors waived any right to payment of amounts not covered by Consumers' health insurance. Moreover, their complaint alleged that Collectors were not entitled to recover amounts allegedly owed to a third party, 360 Surgery Services, which was not named in either of the complaints that Collectors filed against Consumers.

Following amendments filed March 7, 2023, the Complaint now alleges that Collectors' payment policies and practices are unfair and deceptive— designed to induce consumers into undergoing surgery in the expectation that they will not be required to pay out-of-pocket because their costs would be limited to what their health insurers paid for those services. According to Consumers, Collectors violated the MCDCA (Count One) and MCPA (Count Two) by filing lawsuits against them with knowledge that the claimed debts are not owed.

Collectors moved to dismiss Consumers' Complaint, arguing that (1) the common law litigation privilege absolutely immunized all Collectors from liability for filing suit; (2) as an attorney, Hammerman is not liable for his role in these collections because of the professional services exemption in the MCPA, Com. Law § 13-104(a)(1); and (3) the Complaint does not state a claim against Tower Surgical Partners because there are no allegations that Tower Surgical Partners engaged in any collection activity. After briefing and a hearing, the circuit court ruled from the bench that the litigation privilege broadly bars Consumers' claims, the MCPA exemption for attorneys also bars claims against Hammerman, and the Complaint does not set forth facts that state a claim against Tower Surgical Partners. Noting previous amendments and corrections, the court dismissed the Complaint with prejudice. Consumers noted this timely appeal.

STANDARD OF REVIEW

In a decision interpreting the same statutory framework at issue in this appeal, our

Supreme Court summarized the legal standards governing the dismissal of a class action

complaint by plaintiffs alleging violations of the MCDCA and MCPA:

> A defendant may seek dismissal of a complaint under Maryland Rule
> 2-322(b)(2) if the complaint "fail[s] to state a claim upon which relief can be
> granted." Whether a motion to dismiss was properly granted or not by a trial
> court is a question of law we review *de novo*, with no deference given to the
> trial court. In our review, we "must assume the truth of, and view in a light
> most favorable to the non-moving party, all well-pleaded facts and
> allegations contained in the complaint, as well as all inferences that may
> reasonably be drawn from them, and order dismissal only if the allegations
> and permissible inferences, if true, would not afford relief to the plaintiff,
> *i.e.*, the allegations do not state a cause of action for which relief may be
> granted."

*Chavis v. Blibaum & Assocs., P.A.*, 476 Md. 534, 550-51 (2021) (citations omitted); *see*

*also Cain v. Midland Funding, LLC*, 475 Md. 4, 33-34 (2021).

The Court in *Chavis* also reviewed the canons of statutory construction that we will

apply in this appeal:

> When we interpret a statute, our goal is to ascertain and give effect to the
> actual intent of the General Assembly. We begin this inquiry by examining
> the plain meaning of the statutory language. If the language of the statute is
> unambiguous and clearly consistent with the statute's apparent purpose, our
> inquiry ordinarily comes to an end, and we apply the statute as written,
> without resort to other rules of construction. However, we do not analyze
> statutory language in a vacuum. "Rather, statutory language 'must be viewed
> within the context of the statutory scheme to which it belongs, considering
> the purpose, aim, or policy of the Legislature in enacting the statute.'"
>
> "Where the statutory language is subject to more than one reasonable
> interpretation, or its meaning is not clear when considered in conjunction
> with other statutory provisions, we may glean the legislative intent from
> external sources." "Whether the statutory language is clear or ambiguous, it
> is useful to review the legislative history of the statute to confirm that

interpretation and to eliminate another version of the legislative intent alleged to be latent in the language."

We presume that the General Assembly intends its enactments to operate "as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." "[C]onsideration of the consequences of alternative interpretations of the statute grounds the analysis." In each case, we must give the statute in question a reasonable interpretation, "not one that is absurd, illogical, or incompatible with common sense."

*Chavis*, 476 Md. at 554-55 (citations omitted).

As the Supreme Court of Maryland emphasized, the MCDCA and MCPA are "'remedial consumer protection . . . statutes,' the 'overarching purpose and intent' of which 'is to protect the public from unfair or deceptive trade practices by creditors engaged in debt collection activities.'" *Id*. at 552-53 (quoting *Andrews & Lawrence Prof. Servs., LLC v. Mills*, 467 Md. 126, 132 (2020)). "The MCDCA applies to any 'person collecting or attempting to collect an alleged debt arising out of a consumer transaction.'" *Chavis*, 476 Md. at 551 (quoting Com. Law § 14-201(b), defining "collector"). Section 14-202 prohibits these eleven modalities of unfair debt collection:

In collecting or attempting to collect an alleged debt a collector may not:

(1) Use or threaten force or violence;

(2) Threaten criminal prosecution, unless the transaction involved the violation of a criminal statute;

(3) Disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false;

(4) Except as permitted by statute, contact a person's employer with respect to a delinquent indebtedness before obtaining final judgment against the debtor;

8

(5) Except as permitted by statute, disclose or threaten to disclose to a person other than the debtor or his spouse or, if the debtor is a minor, his parent, information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information;

(6) Communicate with the debtor or a person related to him with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor;

(7) Use obscene or grossly abusive language in communicating with the debtor or a person related to him;

(**8**) ***Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist;*** or

(9) Use a communication which simulates legal or judicial process or gives the appearance of being authorized, issued, or approved by a government, governmental agency, or lawyer when it is not.

(10) Engage in unlicensed debt collection activity in violation of the Maryland Collection Agency Licensing Act: or

***(11) Engage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act ["FDCPA"].*** [3]

---

[3] Under section 807 of the federal Fair Debt Collection Practices Act ("FDCPA"), *codified at* 15 U.S.C. § 1692e, debt collectors

may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .

(2) The false representation of—

(A) the character, amount, or legal status of any debt . . . .

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt . . . .

(continued)

Com. Law § 14-202 (emphasis added).

Although violations of the MCDCA are "a *per se* violation of the MCPA as an 'unfair, abusive, or deceptive trade practice'" under Com. Law § 13-301(14)(iii), *Chavis*, 476 Md. at 553, the MCPA

> does not apply to . . . [t]he professional services of a certified public accountant, architect, clergyman, professional engineer, **lawyer**, veterinarian, insurance company authorized to do business in the State, insurance producer licensed by the State, Christian Science practitioner, land surveyor, property line surveyor, chiropractor, optometrist, physical therapist, podiatrist, real estate broker, associate real estate broker, or real estate salesperson, or medical or dental practitioner[.]"

Com. Law § 13-104(a)(1) (emphasis added).[4]

In *Chavis*, the Supreme Court interpreted and applied the same MCDCA subsection at issue in this appeal. Residential tenants who were sued for back rent alleged that those

---

Under FDCPA § 808, *codified at* 15 U.S.C. § 1692f, debt collectors

> may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

[4] Although inapplicable here, we acknowledge that a debt collector cannot be sued under the MCDCA provision incorporating the FDCPA, based solely on the collector filing a claim in a consumer debtor's bankruptcy case. *See generally In re Chorba*, 582 B.R. 380, 390 (Bankr. D. Md. 2018) (dismissing claims under the MCDCA and MCPA because "to the extent that the Defendants possess a right to payment and thus have a right under the [Bankruptcy] Code to file the Proofs of Claim, that conduct cannot form the basis of liability under state law" because "[a] state law that penalizes a party for exercising a right under the Code, or otherwise makes it impossible for that party to exercise such right and comply with applicable state law, is squarely within conflict preemption.").

collectors "violated CL § 14-202(8) by collecting excess post-judgment interest and by including post-judgment court costs (*i.e.*, filing fees to obtain the writs of garnishment) in their requests for writs of garnishment." *Id*. at 553. The Supreme Court explained that

> [t]o prove a claim under this provision of the MCDCA, a complainant must establish two elements: (1) the debt collector "did not possess the right to collect the amount of debt sought"; and (2) the debt collector "attempted to collect the debt knowing that [it] lacked the right to do so."

*Id*. (citations omitted).

"The 'with knowledge' element of this subsection of the MCDCA 'require[s] proof that a debt collector claimed, attempted, or threatened to enforce the non-existent right with actual knowledge or with reckless disregard as to the falsity of the existence of the right.'" *Simmons v. Md. Mgmt. Co.*, 253 Md. App. 655, 666, *cert. denied*, 479 Md. 75 (2022) (quoting *Chavis*, 476 Md. at 563) (some internal quotation marks and citation omitted). "Under CL § 14-203, '[a] collector who violates any provision of [the MCDCA] is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury.'" *Simmons*, 253 Md. App. at 666.

## DISCUSSION

Addressing each issue in turn, we explain: why the litigation privilege does not foreclose these MCDCA/MCPA claims against Collectors; why Hammerman, when filing allegedly false information in support of attorneys' fees claims by his employer Tower Surgical Partners and affiliated entities, cannot invoke the professional services exemption from the MCPA; and why the Complaint states a claim against Tower Surgical Partners

11

based on its pre-surgery statements to Consumers and the collection activities of its employees.

## I. Consumers' MCDCA and MCPA Claims Are Not Barred by the Common Law Litigation Privilege.

In the circuit court, Collectors successfully argued that the common law litigation privilege bars Consumers' claims under the MCDCA and MCPA. Our Supreme Court has stated that the privilege provides immunity from civil liability for certain types of tortious statements made in a judicial proceeding. *See Norman v. Borison*, 418 Md. 630, 650 (2011). Although this privilege originated from English decisions concerning "'defamatory statements made in the courtroom during the course of the trial,'" the scope of the privilege "'extends . . . also to such statements published in documents which have been filed in a judicial proceeding.'" *Id*. at 651 (quoting *Adams v. Peck*, 288 Md. 1, 3 (1980)). It also depends on whether the statements in question were made by witnesses, parties, and judges, or by attorneys appearing in the case. *See Norman*, 418 Md. at 650. For witnesses, parties, and judges, immunity is absolute, applying broadly "even if the statement is wholly unrelated to the underlying proceeding." *Id.* "For attorneys whose appearances are entered in a case, however, we follow the majority American rule and require that the defamatory statement have some rational relation to the matter at bar before unfurling the umbrella of absolute privilege." *Id.* When statements fall within the privilege, a "putative tortfeasor is protected 'even if his [or her] purpose or motive was malicious, he [or she] knew that the statement was false, or his [or her] conduct was otherwise unreasonable[,]'" because courts "give the privilege a broad and comprehensive interpretation, so as to foster the free and

unfettered administration of justice." *Id.* at 651-52 (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 404 (1985) (internal quotes omitted)).

Here, the circuit court concluded that Consumers' MCDCA and MCPA claims were precluded by this common law litigation privilege. With respect to Hammerman, the court rejected the relevance of "federal law on the subject as related to the Federal statute" (*i.e.*, the FDCPA) because "[t]hat is not, in my view, the status of the state law that I am bound to follow." Instead, the court reasoned that

> our appellate courts have made clear, albeit in another context not as related to the two statutes here, that the litigation privilege is broad and is not abrogated by a statute unless there is a clear manifestation in the particular statute of an intent to do so. Here, there is no such clear manifestation in either statute, so I will dismiss both counts against Hammerman on the basis of the litigation or judicial privilege.

With respect to Innovations Surgery Center and Innovative GYN Care, the circuit court also held that "the litigation privilege extends to them as parties[.]" Citing *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394 (2016), *aff'g*, 222 Md. App. 492, 509 (2015), which approved using the litigation privilege as a defense to a claim alleging breach of a non-disparagement agreement, the court recognized that the case "was talking about a defamatory statement" but pointed out that the Supreme Court "went on later in the opinion to recognize that the privilege is not confined in the law of torts to matters of defamation[.]" The judge then explained why he believed the privilege applies in this litigation:

> [H]ere it is important to note that all of the allegedly illegal conduct involves things done in connection with the litigation against each plaintiff. I should say that, in my view, there is nothing inconsistent with applying the common law privilege to both of these statutes. The statutes and the privilege may

13

uncomfortably coexist. Conduct outside of the litigation context proscribed by the statute remains proscribed. The parties must have the freedom that the privilege permits to assert claims in court.

I am not persuaded that any of the cases cited by the plaintiffs in dealing with the two statutes involved here have confronted the defense or the issue that the defendants have presented here, i.e., application of the litigation judicial privilege. So in the final analysis, I will dismiss the complaint because it has already been amended or corrected. I believe any further attempted amendment would be futile, and so dismissal will be with prejudice.

As the circuit court and the parties acknowledged, there is no precedent on this question. Consumers contend that "the litigation privilege is plainly inconsistent with the letter and the purpose of the MCDCA and the MCPA." In support, they cite several reasons that the common law "privilege does not bar Maryland statutory consumer protection claims." First, they argue, "the General Assembly's incorporation of the FDCPA into the MCDCA is clearly inconsistent with litigation privilege." Second, "no Maryland court has applied the litigation privilege" to bar "statutory consumer protection claims" and "other courts have rejected it." Third, neither the nature nor the history of this privilege supports its application to consumer protection claims. To the contrary, Consumers continue, "Maryland's General Assembly clearly intended to abrogate the litigation privilege in favor of a consumer protection statutory scheme."

For reasons that follow, we conclude that the common law litigation privilege does not bar these statutory claims alleging that Collectors violated the MCDCA and MCPA by filing suit to collect money they know these Consumers do not owe. Based on the limited scope of the privilege, as well as the language, purpose, and history of the MCDCA and MCPA; persuasive precedent; and the consequences of applying the privilege to bar claims

14

in this context, we agree with Consumers and Amici that the litigation privilege does not immunize Collectors against the MCDCA and MCPA remedies asserted by Consumers.

## A. Scope of the Litigation Privilege

Consumers argue that Collectors "overstate the scope of the litigation privilege" in a manner that extends to all tort claims, which is inconsistent with recent appellate decisions applying the MCDCA to litigation conduct. In their view, this common law immunity "does not bar Maryland statutory consumer protection claims" predicated on "the unfair and deceptive business practice of suing for money not owed" because such claims "do not involve defamation or claims akin to defamation . . . involv[ing] communication with a third-party causing reputational harm."

Collectors, citing *Mixter v. Farmer*, 215 Md. App. 536 (2013), counter that the litigation privilege now extends to other tort claims, including these allegations under the MDCDA and MCPA that Collectors made "false claims in a debt collection lawsuit." In Collectors' view, restricting the privilege "to 'defamation-like torts' is mistaken" because "[t]his Court has made clear that 'the policy behind the privilege would be severely undercut if the absolute privilege were to be regarded as less than a bar to all actions arising out of the 'conduct of parties and/or witnesses in connection with a judicial proceeding.'" *See id.* at 547 (quoting *Sullivan v. Birmingham*, 416 N.E.2d 528, 534 (Mass. Ct. App. 1981); *Devlin v. Greiner*, 371 A.2d 380 (N.J. Super. Ct. 1977)).

We agree with Consumers that the circuit court misinterpreted the scope of this common law privilege. In particular, we are not persuaded by Collectors' contention that

under *Mixter*, the litigation privilege bars these MCDCA/MCPA claims simply because they are tort claims predicated on statements made in court.

Although these MCDCA/MCPA claims may be classified as tort actions,[5] for which Consumers may recover a "tort type remedy" for "emotional distress" as alleged in their Complaint, the litigation privilege does not broadly apply to any and all torts. Nor does it cover any and all claims predicated on statements made in court. To the contrary, this absolute privilege has been applied narrowly, usually only to claims alleging injury from disparaging statements made in litigation, reflecting that its purpose

> is to protect "the free and unfettered administration of justice," by "serv[ing] the ultimate goal of information exchange and discovery of the truth." . . . It is key to this process that all evidence material to the search for the truth be available to the decision-maker, regardless of whether ***the evidence harms, could harm, or appears to harm someone's reputation***.
>
> Because "[t]he ultimate purpose of the judicial process is to determine the truth," ***participants in a legal proceeding must be free to speak without "fear of private suits for defamation." A witness who faces the prospect of civil liability for the words he speaks at trial will be reluctant to testify, and if he does testify, may distort his testimony to protect himself.*** "[T]he fear of subsequent liability" may limit or skew the evidence the decision-maker needs to fairly decide the case. It therefore is of "great importance to the administration of justice that ***witnesses should testify with minds absolutely free from the apprehension of being annoyed by civil actions for any thing they may say as witnesses.***" The absolute litigation privilege is so important to the administration of justice in an adversary system that ***it will apply even though an "incidental result" may be protection of an "evil disposed and malignant slanderer."***

---

[5] *See generally J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) ("A cause of action for breach of a duty imposed by statute or case law, and not by contract, is a tort action."): *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings, LLC*, 929 F. Supp. 2d 502, 513 (D. Md. 2013) ("Insofar as plaintiff is alleging damages for statutory violations of the FDCPA and the MMFPA, premised on violations of the MCALA, her claims sound in tort.").

*O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 222 Md. App. 492, 509-10 (2015) (citations omitted) (emphasis added), *aff'd*, 447 Md. 394 (2016).

To be sure, this Court has recognized that the scope of the litigation privilege may be expanded when "a broad reading of absolute privilege makes sense from a policy perspective." *Mixter,* 215 Md. App. at 547. Yet neither our decision, nor our reasoning in *Mixter* supports Collectors' argument that the litigation privilege covers the MCDCA/MCPA claims asserted by Consumers.

In that case, we observed that disparaging letters sent in anticipation of an attorney grievance proceeding by a former client regarding an attorney's "unprofessional conduct" *might* be absolutely privileged in order to "foster the 'free and unfettered administration of justice.'" *Id*. at 543 (citation omitted). This Court first acknowledged there was "no Maryland law specifically applying absolute privilege to" the non-defamation causes of action such as "intentional infliction of emotional distress . . . ." *Id.* at 545-46. However, this Court also found "precedent for applying absolute privilege to torts beyond defamation ***when those other torts arise from the same conduct as the defamation claim***." *Id*. at 546 (emphasis added) (citing *Walker v. D'Alesandro*, 212 Md. 163, 169 (1957) (observing in *dicta* that "[p]rivilege "is not confined in the law of torts to matters of defamation"); *Carr v. Watkins*, 227 Md. 578, 582-83 (1962) (observing that "if there was immunity from liability for defamation, there was immunity from liability for the other alleged torts" of invasion of privacy and malicious interference with contract rights)).

Yet *Mixter* did not address the statutory consumer remedies at issue here, much less provide conclusive authority for expanding the scope of the litigation privilege beyond

17

defamation-like claims to these MCDCA/MCPA claims. Instead, the observation cited by Collectors is mere *dicta*, because this Court did not decide whether the privilege applied to those causes of action. Instead, we affirmed summary judgment on the ground that the claimant failed to plead or proffer sufficient facts to establish all the elements required to prove those claims. *See Mixter*, 215 Md. App. at 547-49 (holding that plaintiff failed to plead sufficient facts to establish that disparaging communications constituted "extreme and outrageous" conduct, induced a third party to breach a contract with plaintiff, or interfered with "a specific future relationship").

More than two years later, in *O'Brien & Gere Eng'rs*, the Supreme Court recognized that it, too, had addressed the litigation "privilege only in the defamation context." *O'Brien & Gere Eng'rs, Inc.*, 447 Md. at 398. At issue in that case was a claim for breach of a non-disparagement clause in a settlement agreement between the City of Salisbury and its design engineer, regarding a problematic public construction project. *See id.* at 398, 401-02, 414. Affirming this Court, the Supreme Court held that the litigation privilege covered statements denigrating the professional competency of the engineering firm, made by the City's witnesses during third-party litigation with a non-settling construction manager, because the challenged "statements were essential to the City's case that [the manager] breached its contract with the City" and "were made in the mutually anticipated court proceedings in which both parties clearly contemplated that [the engineering firm's] work would be discussed." *Id.* at 398-414, 417.

The Court in *O'Brien & Gere* reasoned that "the litigation privilege can apply as a defense to claims sounding in contract" because "the privilege would be 'valueless' or

18

'meaningless' if the opposing party could bar application of the privilege just by drafting the claim with a non-tort label" while "ignor[ing] the possibility that the alleged harm derives from tortious conduct." *Id.* at 413. Applying that principle, the Supreme Court concluded that the "non-disparagement clause here does not prohibit" in-court statements by the City's witnesses during litigation with the construction manager, concerning which of them was "responsible for overseeing" the engineering design. *Id.* at 421, 423. The Court held that litigation privilege barred the engineers from suing the City for breaching its settlement agreement because that cause of action was predicated on alleged harm caused by in-court statements denigrating the engineering firm's professional conduct. *See id.* at 423-24. Absent any provision in the settlement agreement prohibiting the City from portraying the engineering firm in a negative light during litigation that was anticipated by both settling parties, the litigation privilege was not waived. *See id*.

Neither *Mixter* nor *O'Brien & Gere* supplies the sweeping authority contemplated by Collectors, for applying the litigation privilege beyond claims predicated on reputational injuries causing noneconomic and economic damages. Indeed, we agree with Consumers that *O'Brien & Gere* "remains the only reported Maryland case that applied the litigation privilege to something other than common law defamation and defamation-like torts." Yet, even in that case, the privilege applied to a claim alleging a wrongful reputational injury, i.e., breach of a non-disparagement agreement based on denigrating statements made in litigation.

Stretching litigation immunity to cover every claim alleging a false statement made in judicial proceedings would be a proverbial bridge too far. In our view, the scope of this

privilege extends to claims other than defamation when false statements made in litigation cause reputation-related injuries, which may be noneconomic or economic, in circumstances when immunity is reasonably necessary to ensure litigants may speak without concerns about being held civilly liable for such statements.

That is not the type of claim alleged here. Instead, Consumers contend that Collectors wrongfully sued them for money they knew Consumers did not owe, in violation of the MCDCA and MCPA. Consumers' averments that they suffered economic and noneconomic injuries are linked to those false debt claims (i.e., out-of-pocket costs and emotional distress caused by payment demands predicated on Collectors' knowingly false statements that Consumers owe money), not to any disparagement of their reputations (e.g., lost esteem, contracts, business, or earning capacity caused by such false statements that they owe money).

Nonetheless, because Maryland law regarding the scope of the litigation privilege is not settled, we will examine whether applying such common law immunity to bar these claims – that Collectors filed suit to collect money they know is not owed – is consistent with the language and purpose of the MCDCA/MCPA. *See* Com. Law § 14-202(8); Com. Law § 13-301(14)(iii). *Cf. Mixter*, 215 Md. at 547 (addressing alternative grounds for affirming summary judgment "because Maryland law is not settled" on whether the scope of litigation immunity expands "beyond defamation torts when those other torts arise from the same conduct").

## *B. Statutory Language*

Consumers and Amici contend the circuit court's holding that the common law privilege bars "claims under the MCDCA or MCPA is simply not supported by the plain text of the statutes and their parallel Federal claim under the FDCPA." "To the extent of any inconsistency," Consumers argue, "the MCDCA and MCPA abrogate the litigation privilege." Collectors counter that neither statute "expressly abrogate[s] the common law privilege" and "[t]here is . . . no basis for this Court to determine that the MCDCA and/or the MCPA abrogated the common law rule by implication."

Our focus here is on MCDCA subsections § 14-202(8), stating that "[i]n collecting or attempting to collect an alleged debt a collector may not . . . [c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist[,]" and § 14-202(11), providing that debt collectors may not "[e]ngage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act." Relevant here, the FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Among the violations enumerated in that statute are "false representation[s] of the . . . amount . . . of any debt" and "use of any false representation or deceptive means to collect or attempt to collect any debt[.]" 15 U.S.C. § 1692e(2)(a); 15 U.S.C. § 1692e(10). As noted, "[a] violation of the MCDCA also constitutes a *per se* violation of the MCPA as an 'unfair, abusive, or deceptive trade practice.'" *Chavis*, 476 Md. at 553 (quoting Com. Law § 13-301(14)(iii)).

21

A common law defense like the litigation privilege may be abrogated expressly, by enactment of a statute containing an explicit exclusion, or by implication, through adoption of a statutory scheme that so conflicts with the common law right that the two cannot coexist. As our Supreme Court has explained:

> "The General Assembly is authorized to change or abrogate the common law as it may think most conducive to the general welfare, provided it does not in the process run afoul of the federal and state constitutions." Although the Legislature may abrogate the common law through statutory enactments, we have also required a strong pronouncement from the Legislature as evidence of an intention to do so. For abrogation to occur, "the statutory language must indicate an express abrogation or an abrogation by implication by adoption of a statutory scheme that is so clearly contrary to the common law right that the two cannot occupy the same space."
>
> ****
>
> [B]ut [l]egislative abrogation of common law need not be express. Although abrogation by implication is highly disfavored, it is possible in two situations: field preemption and conflict preemption. Field preemption occurs if a new enactment repeals and replaces the entirety of the prior law on a comprehensive basis. Conflict preemption occurs when the new legislation has a clear incompatibility and disharmony with the common law, such that both the common law and the statutes cannot coexist.

*WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 257-59 (2018) (citations omitted).

To the extent these statutory claims are outside the scope of the litigation privilege, *see* Part I.A of this opinion, we discern no conflict between common law litigation immunity and statutory liability under the MCDCA/MCPA. The privilege may coexist with those statutes because there is no conflicting overlap – even if the litigation privilege might apply to defamatory statements made in collections litigation, it would not immunize debt collectors from liability for their unfair and deceptive practice of knowingly filing suit

22

against consumers to demand money that is not owed. In these circumstances, abrogation analysis is not necessary.

But even if we assume *arguendo* that the litigation privilege does apply to these particular statutory claims, we conclude the General Assembly has displaced the common law immunity by enacting specific remedies for this unfair debt collection practice, i.e., filing a lawsuit demanding money that Collectors allegedly know Consumers do not owe. Although there is no explicit disapproval of the common law privilege in either the MCDCA or the MCPA, the statutory language and framework is inconsistent with such immunity.

As Collectors tacitly concede, nothing in the text of the MCDCA or MCPA expressly exempts the act of filing a collection lawsuit with knowledge that it falsely claims a right to payment. In contrast to other subsections of Com. Law § 14-202 identifying specific categories of unfair collection practices, subsections (8) and (11) are silent regarding exceptions. Specifically, § 14-202(4) states that debt collectors, "***[e]xcept as permitted by statute***," may not contact employers "with respect to a delinquent indebtedness before obtaining final judgment against the debtor[,]" and § 14-202(5) providing that debt collectors, "***[e]xcept as permitted by statute***[,]" may not disclose "information which affects the debtor's reputation" to those without "a legitimate business need for the information." (Emphasis added.)

We may fairly infer, from the legislature's inclusion of these explicitly stated exceptions within the list of prohibited debt collection practices, that the legislature did not intend to include other unstated exceptions. *Cf. Williams v. Ewrit Filings, LLC*, 253 Md.

23

App. 545, 560 (2022) ("In light of the Attorney General's broad interpretation that rent collectors must be licensed as collection agencies, the General Assembly carved out a single exemption for real estate brokers and their agents who engage in the collection of rent. By failing to exempt any other rent collection entities in the bill, the General Assembly inferentially manifested its intent that all other rent collectors engage in debt collection activity."), *cert. denied*, 478 Md. 518 (2022). "[T]his form of statutory construction" is known by "the maxim '*expressio unius est exclusio alterius*' or 'to express or include one thing implies the exclusion of the other, or of the alternative.'" *Id*. at 560 n.15 (citations omitted). Although we may not wield "'this statutory construction tool to override the clear intent of the Legislature[,]'" interpreting the MCDCA and MCPA to reach debt collection by litigation "comports with our interpretation of the plain language of the statute." *Id*. (quoting *Md. Ins. Comm'r v. Cent. Acceptance Corp.*, 424 Md. 1, 32 (2011)).

Moreover, in contrast to the circuit court, we view the General Assembly's incorporation of the FDCPA into the MCDCA as evidence of its intent to displace any common law privilege. Like the MDCDA and MCPA, the FDCPA is part of "a 'comprehensive and reticulated' statutory scheme, involving clear definitions, precise requirements, and particularized remedies[,]" along with specific exceptions and explicit references to litigation conduct. *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 233 (4th Cir. 2007). Among these, 15 U.S.C. § 1692e(11) expressly exempts from the prohibition against nondisclosures "that the debt collector is attempting to collect a debt," any nondisclosure of such information in "formal pleadings made in connection with a legal action[.]" Likewise, 15 U.S.C. § 1692i requires a "debt collector who brings any legal

24

action on a debt against any consumer" to do so in accordance with certain venue provisions. As Consumers point out, neither of these provisions would be necessary if the MCDCA/MCPA "as a whole does not apply to formal pleadings because of the litigation privilege" and if "filing suit in the wrong venue would always be privileged conduct."

Moreover, we find it especially significant that federal courts have consistently held there is no litigation privilege for the FDCPA. As the Fourth Circuit Court of Appeals has explained, "[t]he statutory text makes clear that there is no blanket common law litigation immunity from the requirements of the FDCPA." *Sayyed*, 485 F.3d at 23031 (explaining that "common law immunities cannot trump the [FDCPA's] clear application to the litigating activities of attorneys"); *see also Heintz v. Jenkins*, 514 U.S. 291, 299 (1995) (holding that the FDCPA "applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation"); *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 369 (3d Cir. 2011) (recognizing that the "FDCPA does not contain an exemption from liability for common law privileges");; *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 615 (6th Cir. 2009) (citing *Heintz* in recognizing that "the FDCPA is intended to burden debt-collectors even when they are engaged in litigation"). Because the established interpretation of the FDCPA provisions incorporated into the MCDCA is that the litigation privilege does not apply, we may reasonably conclude that our General Assembly understood and also intended that such common law immunity would not foreclose claims alleging violations of the MCDCA under § 14-202(11). *See generally Faulk v. State's Att'y for Harford Cnty.*, 299 Md. 493, 506 (1984)

("Where the purpose and language of a federal statute are substantially the same as that of a later state statute, interpretations of the federal statute are ordinarily persuasive.").

For these reasons, we conclude that by adopting comprehensive consumer protection statutes creating a detailed framework specifying prohibited collection practices and establishing remedies for consumers, the General Assembly effectively foreclosed the application of a common law litigation privilege. *See generally 100 Harborview Drive Condo. Council of Unit Owners v. Clark*, 224 Md. App. 13, 43 (2015) (recognizing that when "a statute and the common law are in conflict, the common law yields to the statute to the extent of the inconsistency") (citation omitted); *Fagerhus v. Host Marriott Corp.*, 143 Md. App. 525, 535-36 (2002) (pointing to statutory language codifying legislative intent to limit common law premises liability standards).

We are not persuaded otherwise by *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380 (Fla. 2007), which the circuit court "found . . . persuasive," and Collectors cite as "the most persuasive state court ruling" that the litigation privilege applies to both common law torts and statutory claims. That decision interpreted Florida's state statute governing consumer debt collection practices, which expressly states that it complements the FDCPA. *See* Fla. Stat. Ann. § 559.552 ("Nothing in this part shall be construed to limit or restrict the continued applicability of the federal Fair Debt Collection Practices Act to consumer collection practices in this state. This part is in addition to the requirements and regulations of the federal act.").

Yet Florida has retreated from its broad sweep of litigation immunity barring all actions, including statutory claims. As the Eleventh Circuit has explained:

26

> *Echevarria* . . . is not the Court's latest word on Florida's litigation privilege. In *Debrincat v. Fischer*, 217 So.3d 68 (Fla. 2017), the Court receded somewhat from the broad language in *Echevarria*. There, Fischer filed a malicious prosecution suit against Debrincat alleging that Debrincat maliciously added Fischer as a party defendant in an earlier action. Debrincat asserted that the litigation privilege immunized his conduct of adding Fischer as a defendant in the earlier action, but the Florida Supreme Court disagreed. It concluded that the litigation privilege does not provide immunity from claims for malicious prosecution, principally because if it did so it "would eviscerate [that] long-established cause of action." *Debrincat*, 217 So.3d at 70.
>
> After *Debrincat*, and despite the broad formulations in . . . *Echevarria*, we do not think that the Florida Supreme Court is of the view that the litigation privilege offers *per se* immunity against any and all causes of action that arise out of conduct in judicial proceedings. *See id.* Rather, the applicability of the privilege must be assessed in light of the specific conduct for which the defendant seeks immunity. In this case, therefore, we must ask whether Florida's litigation privilege would immunize a defendant from a breach of contract claim where the act that allegedly breached the contract was the filing of a lawsuit. We think it would not.

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1218-19 (11th Cir. 2018); *see also EMI Sun Vill., Inc. v. Catledge*, 779 F. App'x 627, 635 n.8 (11th Cir. 2019) (recognizing that Florida Supreme Court "walked that holding [in *Echevarria*] back to some extent" so that courts "must assess the privilege's applicability . . . 'in light of the specific conduct for which the defendant seeks immunity' by asking whether applying the privilege 'would meaningfully serve the aims of the privilege' or 'eviscerate long-standing sources of judicially available recovery'"). Here, immunizing debt collectors for suing consumers to demand payment of money they do not owe would effectively eviscerate the MCDCA/MCPA remedies for such unfair debt collection practices.

27

### C. Purpose and Precedent

When interpreting a statute, we consider "'the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny'" because our "goal is to . . . advance its purpose, not to frustrate it." *Andrews & Lawrence Professional Services*, 467 Md. at 161 (quoting *Lockshin v. Semsker*, 412 Md. 257, 274 (2010)). Both the MCDCA and MCPA prohibit practices "that are unfair and abusive trade practices in the collection of consumer debts." *Id.* at 162. As statutes that "'provide[] remedies not available at common law,'" both "'must be liberally construed, in order to effectuate [their] broad remedial purpose.'" *Id.* (quoting *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 424 (2016)). Indeed, the Supreme Court of Maryland "has warned against construing remedial statutes like the CPA with a 'narrow or grudging process' that 'exemplif[ies] and perpetuate[s] the very evils to be remedied.'" *Id.* (quoting *Pak v. Hoang*, 378 Md. 315, 326 (2003)).

Reading the statutory scheme to preclude application of the common law litigation privilege to claims against debt collectors for violating the MCDCA and MCPA is consistent with the purpose and goals of these remedial statutes, to provide consumers a remedy for unfair debt collection practices and collectors an incentive not to commit them. As we will detail below, *see* Part I.E of this opinion, the contrary construction adopted by the circuit court negates the remedial impact of these statutes.

Construing the MCDCA and MCPA to foreclose a litigation privilege defense to such claims is also consistent with our precedent applying these statutory remedies. As Consumers and Amici point out, recent Maryland case law features examples of

28

MCDCA/MCPA claims predicated on litigation asserting a right to payment that those debt collectors allegedly knew they did not have – none of which were foreclosed by an assertion of litigation privilege as a complete defense:

- In *Assanah-Carroll v. L. Ofcs. of Edward J. Maher, P.C.*, 480 Md. 394, 442-43 (2022), our Supreme Court, answering certified questions from the federal district court, held that because "a landlord may not engage in debt collection activities or pursue claims against a tenant who has failed to pay rent attributable to a period during which the landlord was unlicensed" in violation of a licensing law enacted by a municipality or county, "a tenant may have a right of action under the MCDCA and the MCPA where the landlord engages in such activity, and the tenant can establish that the unlawful conduct caused damages."

- In *Simmons*, 253 Md. App. at 681-94, this Court held that consumer-tenants stated MCDCA and MCPA claims against landlord-debt collectors for filing lawsuits and obtaining judgments on time-barred rent they did not have the right to collect, based on false statements that a 12-year statute of limitations applied. Rejecting the debt collectors' mistake-of-law defense, we concluded that landlord-debt collectors may be liable for acting with reckless disregard of legal authority that the claimed right to payment did not exist. *See id.* at 683.

- In *Chavis*, 476 Md. at 541-42, 553-54, our Supreme Court reversed the dismissal of class actions against a landlord and its attorney for violating the MCDCA and MCPA by filing writs of garnishment that included post-judgment interest at a rate above the legal limit. Emphasizing that "the remedial nature of the MCDCA requires that we interpret § 14-202(8) broadly to reach any claim, attempt, or threat to enforce a right that a debt collector knows does not exist[,]" *id.* at 560, the Court explained that the knowledge element of a claim under Com. Law § 14-202(8) for enforcing a "non-existent right" is satisfied by pleading and proof that the debt collector acted "'with actual knowledge or with reckless disregard as to the falsity of the existence of the right.'" *Id.* at 563 (citation omitted). The Court rejected the Maryland Bar Association's request to recognize an unwritten statutory exception for attorneys, emphasizing that "[t]he General Assembly undoubtedly knows that some 'collectors,' as defined in the MCDCA are attorneys" but "has not exempted attorney collectors from the requirements and prohibitions of the MCDCA." *Id.* at 570. The Court expressly disapproved the argument, echoed here in the circuit court's reasoning that the litigation privilege is necessary to preserve access to the courts, that applying these statutory consumer protections to "attorney debt collectors" who litigate claims with knowledge that a debt is not owed would "'chill legitimate advocacy and interfere with the attorney-client relationship.'" *Id.* at 570, 571.

- *NationStarMortg., LLC v. Kemp*, 476 Md. 149, 161, 193 (2021), held that a mortgagee stated a viable claim under Com. Law § 14-202(8) based on mortgage lender Nationstar's "claim of a right to assess a property inspection fee, the illegality of the fee that Nationstar claimed, and Nationstar's knowledge that the right did not exist."

- In *Cain*, 475 Md. at 13, 29-30, the Supreme Court held, *inter alia*, that a defendant-collector who purchased consumer debts could be held liable under MCDCA § 14-202(8), subject to a three-year limitations period, for improper debt collection activities in connection with money judgments it obtained against consumers at a time when the debt collector "was not licensed as a collection agency under Maryland law."

- In *Newsom v. Brock & Scott, PLLC*, 253 Md. App. 181, 212 (2021), this Court reversed the grant of a motion for judgment in favor of a collection attorney and his law firm, acting as substitute trustee to foreclose under a disputed deed of trust. Concluding that under "*Andrews*, *Chavis*, and *Nationstar*[,]" the attorney and law firm could have "acted knowingly or recklessly in proceeding without further investigation" of the homeowner's claim that her late husband forged her signature on the deed of trust, *id.*, we revived an MCDCA claim based on evidence that the debt collectors "did not possess the right to foreclose upon her home, either because the Deed of Trust was not signed by her, or because the Deed of Trust was not recorded within six months after Mr. Newsom's death and no timely claim was filed in his estate." *Id*. In doing so, we observed that "the remedial nature of the MCDCA requires that we interpret § 14-202(8) broadly to reach any claim, attempt, or threat to enforce a right that a debt collector knows does not exist." *Id.* at 208 (emphasis omitted).

- In *Andrews & Lawrence Professional Services*, 467 Md. at 155, 160, the Supreme Court rejected an attempt to exempt attorneys from MCDCA and MCALA requirements. The Court reasoned that the General Assembly created a broad exemption for "professional services" in the MCPA but limited the licensing requirement in MCALA to attorneys using a non-lawyer employee in their collection business and did not include in the MCDCA any language that would exempt attorneys or professional services. *See id.* at 154-55, 160.

- In *LVNV Funding, LLC v. Finch*, 463 Md. 586, 612 (2019), the Supreme Court affirmed an MCDCA judgment against a debt collection agency that obtained default judgments against consumers at a time when it was not licensed, because "[a]n unlicensed debt collector who, in furtherance of its business, attempts to collect a debt through litigation unquestionably is attempting to enforce a right that,

*for it*, does not exist[,]" in violation of the MCALA, MCDCA, and MCPA. *See* Com. Law § 14-202(8).

In none of these cases did the common law litigation privilege foreclose the MCDCA/MCPA remedies.[6] Consequently, the circuit court's conclusion that Consumers' MCDCA/MCPA claims are barred by this privilege is inconsistent with our case law applying these statutes in light of their general remedial purpose to prohibit unfair debt collection and their specific remedial purpose to compensate consumers when debt collectors knowingly demand payment of money that is not owed.

### D. Post-Enactment History

A review of post-enactment history corroborates our conclusion that MCDCA/MCPA claims are not subject to a common law litigation privilege. *See generally Chavis*, 476 Md. at 554-55 (recognizing that legislative history "is useful . . . to confirm that interpretation"). As our Supreme Court has explained, "if the General Assembly

---

[6] Consumers and Amici also direct our attention to extra-jurisdictional cases as additional persuasive authority for declining to recognize a litigation privilege for prohibited consumer debt collection claims because "[u]nfair debt collection practices could be immunized merely by filing suit on the debt." *People v. Persolve, LLC.*, 218 Cal. App. 4th 1267, 1275 (2013). *See Komarova v. Nat'l Credit Acceptance, Inc.*, 175 Cal. App. 4th 324, 336-37 (2009); *Scott v. Am. Express Nat'l Bank*, 22 Wash. App. 2d 258, 270, ("applying litigation privilege would defeat the public policy considerations justifying the privilege"), *review denied*, 200 Wash. 2d 1021 (2022); *Osinubepi-Alao v. Plainview Fin. Servs., Ltd.*, 44 F. Supp. 3d 84, 92 (D.D.C. 2014) (declining to "broaden the application of the District of Columbia's litigation privilege doctrine to include the Debt Collection Practices Act"); *Campos v. Brooksbank*, 120 F. Supp. 2d 1271, 1278 (D.N.M. 2000) (recognizing that litigation privilege would allow debt collector to "be insulated from defending a . . . claim simply because the alleged misrepresentations and abuses occurred within an otherwise sanctioned activity"); *Sykes v. Mel Harris &Assocs., LLC*, 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010) ("Because plaintiffs have not claimed defamation, the [litigation] privilege is wholly inapplicable" to class action consumer complaint under FDCPA).

believes that [an] exemption" in the MCDCA or MCPA "should be expanded to include another class of individuals or entities, it may do so." *Andrews & Lawrence Professional Services*, 467 Md. at 165. Despite our judicial decisions applying the MCDCA and MCPA to litigation brought by debt collectors, the General Assembly has not amended either statute to add a litigation exception to its prohibition against "claim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right does not exist." Com. Law § 14-202(8).[7] This absence of action by the General Assembly indicates that the body concurs with our judicial decisions and does not believe the incorporating the common law litigation privilege would align with the purpose of the MCDCA or MCPA.

---

[7] Legislative history for the MCDCA and MCPA confirms that the General Assembly has not added an exception for debt collection lawsuits, despite at least one proposal to do so. As Amici point out, a bill proposed but not passed in 2014 would have amended the Commercial Law Article to "exempt debt collection by litigation from the scope of Maryland's various statutes governing consumer debt collection conduct[.]"*See* H.B. 417, 2014 Leg., 434th Sess. (Md. 2014) (proposing exemption for a "collection agency" engaged in "passive debt collection," which "means" in part "directly or indirectly collecting the debt, including through civil litigation"); S.B. 284, 2014 Leg., 434th Sess. (Md. 2014) (same). We acknowledge "'[l]egislative rejection is not an infallible indicator'" given that a proposed amendment may have been unsuccessful "'for a myriad of . . . reasons[.]'" *Smith v. Westminster Mgmt., LLC*, 257 Md. App. 336, 372 (2023) (quoting *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 329 (2006), *aff'd*, 486 Md. 616 (2024)). *See also Demory Bros. v. Bd. of Pub. Works*, 273 Md. 320, 326 (1974) (recognizing that courts generally do not treat "'the amendment-rejection theory [a]s a completely determinative method of ascertaining legislative intent,'" but "that such action strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted"). Nevertheless, we may consider such an unsuccessful proposal as evidence that is consistent, albeit not conclusive, with our determination that the General Assembly understands that the current subsection 14-202(8) proscription may be applied to claims asserted in litigation. *Cf. Hudson v. Hous. Auth. of Balt. City*, 402 Md. 18, 32 (2007) (noting that "'[o]ne form of legislative history useful in determining legislative intent is amendments proposed but later rejected by the Legislature'") (quoting *State v. Bell*, 351 Md. 709, 721 (1998)).

### *E. Consequences*

Finally, and most importantly, we give "commonsensical" consideration to the undesirable consequences of extending absolute immunity under common law to foreclose statutory remedies against debt collectors using the courts to demand payment of money they know a consumer does not owe. *Cf. Drew v. First Guar. Mortg. Corp.*, 379 Md. 318, 328 (2003) ("our role is to apply a 'commonsensical' approach to the information available to us so that we may best effectuate the General Assembly's intent"). Such "'[a]n examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality.'" *Blue v. Prince George's Cnty.*, 434 Md. 681, 689 (2013) (citation omitted).

Consumers and Amici contend that the circuit court's ruling shelters debt collectors' "unfair or deceptive conduct when collecting by litigation[,]" thereby rewarding their "dishonesty" and violation of the law with "unfair profits." Holding that these statutory remedies are foreclosed by a common law litigation privilege would have "the effect of improperly weakening the remedial protections that the Legislature actually intended[,]" so that "[a]bsent reversal, all manner of debt collection practices governed by the minimum standards set forth in the MCDCA and MCPA will be eroded."

We agree that applying a litigation privilege to bar these MCDCA and MCPA claims undermines the remedial purpose of these consumer protection statutes, by effectively giving debt collectors the carte blanche of absolute immunity to commit the unfair debt practice of demanding payment of money that the collector knows the consumer

33

does not owe, as long as the collector does so by filing suit against the consumer. As Amici point out, immunizing debt collectors would prevent consumers from challenging "unfair or deceptive conduct when collecting by litigation[,]" resulting in "unfair profits for" debt collectors who circumvent the proscriptions of the MCDCA and MCPA simply by filing suit, as well as competitive advantages over "honest businesses[,]" and potentially disproportionate impact on "lower-income people and communities of color."[8]

Indeed, the potential rewards of filing such a lawsuit, with no risk of being held accountable for violating the MCDCA and MCPA, would incentivize debt collectors to take unjustified claims to court. Some consumers, when sued for money that is not owed, may nevertheless opt to pay something to resolve the suit, rather than expending time and financial resources to fight in a forum where debt collectors may have advantages that come with familiarity and frequency. Others may lack the financial or information resources to mount a timely defense, resulting in an enforceable judgment predicated on an unjustified debt claim. For those who do contest the lawsuit, its pendency in court still may have economic and non-economic costs relating to expenses and stress of litigating

---

[8] Amici point to harmful "effects of the exploding medical debt crisis[,]" citing authorities reporting that in 2022, medical debt constituted "58% of all debts in collections" and "62% of bankruptcies . . . related to medical debt[,]" and that "1 in 3 Black adults have past-due medical bills, compared to fewer than 1 in 4 white adults." Berneta Haynes, National Consumer Law Center, *The Racial Health and Wealth Gap: Impact of Medical Debt on Black Families* 2 (Mar. 2022), available at https://www.nclc.org/wp-content/uploads/2022/09/RacialHealth-Rpt-2022.pdf (last visited Sept. 18, 2024). According to the Urban Institute's interactive map of "Debt in America," updated in September 2024, 4% of Maryland's population had debt in collections status, averaging $1,082. *See* Urban Inst., *Debt in America: An Interactive Map*, https://apps.urban.org/features/debt-interactive-map/?type=medical&variable=nohealthinsurance&state=24 (last visited Sept. 18, 2024).

(e.g., retaining an attorney, filing fees, lost work, childcare expenses, lowered credit scores, etc.). In addition to "undue stress, loss of income and wages, liens on homes, and other long-term harm to financial stability[,]" for example, aggressive collection practices for medical debts may cause consumers "to use other types of risky financial instruments, like credit cards and payday loans, to pay their medical debts." Berneta L. Haynes, *National Consumer Law Center, The Racial Health and Wealth Gap: Impact of Medical Debt on Black Families* 15, 16 (Mar. 2022), *available at* https://www.nclc.org/wp-content/uploads/2022/09/RacialHealth-Rpt-2022.pdf (last visited Sept. 18, 2024).

Here, Consumers each allege that she was "damaged by [Collectors'] actions in that she was required to retain counsel to defend her in the collection action" and "suffered emotional distress, with and without physical manifestations[.]" In Anderson's case, that also included her "concern[] that the stress arising from [Collectors'] suit would threaten her pregnancy."

We discern nothing in the MCDCA or MCPA to indicate that the General Assembly contemplated that debt collectors could gain litigation immunity inside the courthouse for unfair debt collection practices that are expressly prohibited outside the courthouse. In these circumstances, debt collectors facing the prospect of civil liability for suing consumers on debts they know are not owed will be reluctant to make such claims. That result grounds our interpretation of the MDCDA and MCPA in reality. *See Blue*, 434 Md. at 689.

35

### F. Conclusion

We decline to interpret the MCDCA and MCPA in a manner that permits consumer debt collectors to circumvent prohibitions against a collection practice that the General Assembly has identified as unfair. *See* Com. Law § 13-301(14)(iii); Com. Law § 14-202(8), § 14-202(11). By every measure we use to interpret the MCDCA and MCPA – text, purpose, precedent, legislative history, and consequences – we conclude that the General Assembly did not intend the litigation privilege at common law to prevent consumers from using these statutory remedies to hold debt collectors accountable for filing lawsuits to demand payment of money they know is not owed. Consequently, we hold that the circuit court erred in dismissing Consumers' Complaint on privilege grounds.

**II.  The Professional Services Exemption Under the MCPA Does Not Foreclose the MCPA and MCDCA Claims Against Hammerman.**

The circuit court ruled, as an alternative ground for dismissing the claims against Hammerman, who is general counsel for Tower Surgical Partners, "in-house counsel" for other Collectors, and filed claims against Consumers on behalf of Innovative GYN Care and Innovations Surgery Center, that Hammerman is immune from liability under the exemption in the MCPA for "the professional services of a . . . lawyer." Com. Law § 13-104(a)(1). Consumers contend that was error. Citing *Scull v. Groover, Christie & Merritt, P.C.*, 435 Md. 112, 127, 132 (2013), and *Andrews & Lawrence Professional Services*, 467 Md. at 154, Consumers argue that this statutory exemption covers only claims based on a professional's "quality of care," not claims based on "balance-billing" matters, which "are commercial, not professional, and thus[] not exempt." Although the MCPA exempts

36

attorneys from liability for "acts that require a law license," Consumers contend that the MCDCA does not exempt attorneys "from liability for mere debt collection activity that a non-lawyer could perform." In their view, extending the professional services exemption to attorney billing practices "would effectively privilege attorneys over all other professionals," by sheltering a lawyer "suing to collect an inflated bill *for his own inflated legal services*[,]" but not "non-lawyers seeking the exact same inflated amounts[.]"

Collectors argue that the circuit court correctly ruled that "[t]he claims against Hammerman" fall within the professional services exemption, because they "all arise out of the filing of the collection lawsuit on behalf of his clients and the filing of a purported false affidavit as to the amount of time expended for attorneys' fees and his client's entitlement to those fees." *See Andrews & Lawrence Professional Services*, 467 Md. at 155 n.7 (characterizing "actions in filing lawsuits or filing liens" as "professional services that only a licensed attorney could undertake"). We disagree.

A consumer may invoke the MCDCA and MCPA when the amount claimed by a debt collector includes sums that the collector, to its knowledge, does not have the right to collect. *Cf. Smith v. Westminster Mgmt., LLC*, 257 Md. App. 336, 380-82 (2023), *affm'd.*, 486 Md. 616 (2024) (holding that factual disputes about sums that a residential property manager claimed tenants owed precluded summary judgment on MCDCA/MCPA claims). Here, Consumers allege in their Complaint that Hammerman falsely stated under oath in his affidavits, filed in each case, that "he dedicated approximately six (6) hours including but not limited to client communication, review and analysis of client file documents, the drafting of the Complaint, and Motion for Summary Judgment." Consumers alleged that

37

Hammerman did not spend six hours preparing the action, given numerous mistakes in the complaint, and identical attorneys' fees in another case that did not involve drafting a summary judgment.

In *Scull*, 435 Md. at 114-15, as in this case, a consumer sued a medical practice and its attorney for violating the MCPA by balance-billing for medical debts that the consumer did not owe. Our Supreme Court distinguished between, on the one hand, the "entrepreneurial" and "commercial" activities of a professional defendant, and on the other hand, the trained medical services rendered by that business. *See id.* at 132. The Court held that the attorney was not exempt for conduct undertaken in his collection role because "[t]he commercial aspects of a medical practice, such as compliance with laws concerning who may be billed and how, are not exempt from the Consumer Protection Act." *Id.*

Moreover, since then, the Supreme Court of Maryland has clarified that regardless of whether they may be exempt under the professional services provision in the MCPA, attorneys are not exempt from liability under the MCDCA. In *Andrews & Lawrence Professional Services*, the Court held that when

> a lawyer or law firm engages in debt collection activity which: (1) requires a license under MCALA; or (2) which would be prohibited under the MCDCA, the professional services exemption of the CPA, CL § 13-104(1) does not apply to the conduct or services.

467 Md. At 156. Consistent with these interpretations of the statutory scheme, this Court, in *Simmons*, 253 Md. App. at 683, 704-05, held professional debt collectors ***and their attorneys*** were presumed to be aware of laws governing their collection activities, so that injunctive relief was available under the both the MCDCA and MCPA, to recover monies

received by the attorney as a result of wrongful debt collection of time-barred back rent from consumer tenants.

Here, the same distinctions apply. To be sure, Hammerman's conduct as an attorney – in filing suit and preparing pleadings on behalf of Collectors – falls within the ambit of his professional legal services and exempts him from liability for those acts under the MCPA. Yet, like the medical billing and collection activity outside the scope of this exemption in *Scull, Andrews & Lawrence Professional Services*, and *Simmons*, Hammerman's other conduct – submitting his allegedly false affidavits describing the nature and amount of his legal services in support of the attorneys' fee component of lawsuits filed by Collectors – falls within "[t]he commercial aspects" of his law practice and therefore is not exempt under the MCPA. Nor is there any exemption from liability for unfair collection practices available under the MCDCA.

For these reasons, the Complaint states viable MCDCA and MCPA claims against Hammerman. The circuit court erred in ruling otherwise.

### III. Consumers State Claims Against Tower Surgical Partners.

In their final assignment of error, Consumers contend that the circuit court erred in ruling that they failed to plead sufficient facts to state a claim against Tower Surgical Partners. According to Consumers, they alleged enough "facts based just on Tower Surgical Partners' own acts," as well as facts supporting vicarious liability based on Hammerman's actions. Collectors counter that "the circuit court correctly held that there were no allegations" that Tower Surgical Partners "engaged in any collection activity."

Once again, we agree with Consumers that their averments are sufficient to state MCDCA and MCPA claims against Tower Surgical Partners. Here, the Complaint alleges that Tower Surgical Partners "directed" Anderson to endorse and forward checks she received from her insurer, then told her "that once it did receive the checks 'she would be good' and her account would be 'zeroed.'" Although the collection lawsuit that ISC filed against Anderson alleged that her agreement was with "ISC/360SURGICAL[,]" it

> was supported by an affidavit from an Anna Grigoryan-Santos, described as a "senior accountant" for [Tower Surgical Partners,]" which "alleged that [she] had 'personally inspected' [Tower Surgical Partners'] records and "upon the basis of [her] personal knowledge and in support of this litigation" that "Defendant is in default" and that the allegations in the complaint were true.

> Also filed with the Anderson complaint was an affidavit supporting an attorneys'

fee claim "of $1,928.44 (*i.e.*, 15% of the principal balance)," from Hammerman, who "is in-house counsel at Defendant [Tower Surgical Partners], and . . . de facto in-house counsel for [Innovations Surgery Center], [Innovative GYN Care], [360 Surgery Services] and the other affiliated entities that this medical practice uses." As previously discussed, Consumers allege that Hammerman falsely claimed to have "dedicated approximately six (6) hours" on the matter. More broadly, Consumers allege, Hammerman acted on behalf of Tower Surgical Partners in all its collections matters, including during a 22-day period "between July 8 and July 30, 2022[,]" when he "filed 22 collections actions in various District and Circuit courts on behalf of [Tower Surgical Partners] and various affiliates, including [Innovations Surgery Center] and [Innovative GYN Care.]"

40

The Tower Surgical Partners-related allegations are fewer with respect to Diehl because her contacts regarding billing were with Innovations Surgery Center and Innovative GYN Care, which provided her a written "Financial Policy Disclosure Statement" that "[w]e will not balance bill for any amounts not covered with the out-of-network benefit as long as the payment you receive is given in full to" Innovative GYN Care. Nevertheless, when Innovative GYN Care and Innovations Surgery Center "filed suit against [] Diehl," they did so "through Hammerman and Tower Surgical Partners[.]" Accompanying that complaint was "an almost identical 'Plaintiff's affidavit' from Grigorian-Santos of Tower Surgical Partners, claiming personal knowledge that [Diehl] was in default and that the allegations in the complaint were true[,]" as well as "an almost identical attorneys' fees affidavit from Hammerman[,]" apparently acting in his dual capacity, both as Tower Surgical Partners' general counsel with responsibility for other Collectors' collection matters, and as counsel of record for Innovative GYN Care and Innovations Surgery Center.

In support of direct liability, Consumers allege that Tower Surgical Partners violated the MCPA "by using unfair practices to collect a debt, particularly . . . [s]eeking attorneys' fees for . . . in-house counsel Hammerman," "using a false attorneys' fee affidavit by Hammerman[,]" and "[a]ttempting to collect money allegedly owed to [360 Surgery Services] in a suit brought only by ISC." Consumers also aver "that [Tower Surgical Partners'] employee Grigoryan-Santos produced affidavits in support of its collections actions against" both Consumers, violating MCDCA subsection 14-202(11) and the FDCPA, by using false statements while "engaged in the collection of a debt by offering

sworn testimony on behalf of CIGC to collect money." Consumers maintain that because "[Tower Surgical Partners'] affidavits . . . contained false representations of the amount owed, and also attempted to collect money not owed at all," Tower Surgical Partners may be held liable to Consumers for its own actions.

Likewise, in support of vicarious liability "for Hammerman's conduct," Consumers cite their allegations that the attorney, who "is an employee of [Tower Surgical Partners], as well as general counsel[,]" while "[i]n the course of his employment" as general counsel for Tower Surgical Partners, "sought to collect money from [Consumers] that they did not owe." Because "[Tower Surgical Partners] is liable for the actions of its attorney-employee in attempting to collect debts on its behalf[,]" Consumers argue that the circuit court erred in dismissing Tower Surgical Partners.

Because we must assume, for purposes of reviewing this dismissal, the truth of these allegations that Tower Surgical Partners participated both directly and indirectly in the debt collection, through direct contact with Anderson and by submitting its employees' false affidavits in support of both lawsuits claiming debts that Tower Surgical Partners knows these two Consumers do not owe, we conclude that the Amended Complaint adequately pleads that Tower Surgical Partners violated statutory prohibitions against unfair debt collection practices, ranging from using false statements to collect debts, to misrepresenting amounts owed, and attempting to collect amounts not authorized by contract and/or not owed. *See* Com. Law § 14-202(8), § 14-202(11) (incorporating 15 U.S.C. § 1692e(1), § 1692e(2)(A), § 1692f(1)).

42

Based on these allegations, Tower Surgical Partners might be liable for the collection conduct of its counsel and employees. As discussed, in *Andrews & Lawrence Professional Services*, 467 Md. at 163, our Supreme Court declined to "interpret the statutory exemption for a lawyer's professional services to cover another class of individuals – the lawyer's clients – where no such exemption exists in the plain language of the statute, and where such an expanded interpretation would run contrary to the purpose and intent of this remedial statute." *Cf. Simmons*, 253 Md. App. at 693 (holding that even "when a lawyer engages in professional services to which the exemption applies, such as filing a lawsuit to recover delinquent fees or filing a statement of lien under the Maryland Contract Lien Act, the lawyer's client does not benefit from the exemption"). Given the allegations regarding the roles played by these two Tower Surgical Partners employees in collecting debts on behalf of Innovative GYN Care, Innovations Surgery Center, and 360 Surgery Services, Tower Surgical Partners also may be liable under an alternate theory that it is an "integral part[] of a composite corporate structure that sought to avoid regulation of the very kind of activity that the General Assembly believed needed regulation." *LVNV Funding LLC*, 463 Md. at 605. For these reasons, the circuit court erred in dismissing the MCDCA and MCPA claims against Tower Surgical Partners.

## CONCLUSION

Because the circuit court erred in dismissing the Complaint, we will vacate the judgment and remand for further proceedings on all claims against all Collectors. In doing so, we express no opinion on the pending request for class certification.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEES TO PAY THE COSTS.**

44

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1254s23cn.pdf